OPINION OF THE COURT
Acting Chief Judge Simons.
In this tax certiorari proceeding, the issue presented for review is whether Supreme Court properly valued petitioner Allied Corporation’s property for tax purposes in 1987 and 1988. The property consists of more than 1,000 acres of earthen-walled wastebeds and buffer zones where waste material from an industrial process has been deposited to eventually solidify. Respondent Town of Camillus contends that the property was used as a holding and settling facility for the waste, even though the plant producing the waste had ceased operations, and should be valued as such. Inasmuch as there was no comparable market data for such a use, it viewed the property as a specialty using the cost of reproduction less depreciation to value the property. Petitioner maintains that because the property was no longer receiving waste in 1987 and 1988, it had no further industrial use and should be valued by the comparable sales method as a property having no immediate practical use, not as a specialty. Even if the property is valued as wastebeds, it claims the property is fully depreciated and therefore should be valued as vacant land.
Supreme Court concluded that the property could not be valued as a specialty because the wastebeds were no longer in use and the improvements were no longer appropriate and economically feasible (see, Matter of County of Suffolk [C. J. Van Bourgondien, Inc.] 47 NY2d 507, 511-512). Finding a highest and best use of the buffers as recreational and concluding the wastebeds had no foreseeable use for 20 to 25 years, it determined the value by means of comparable sales *354 in the area. The Appellate Division affirmed. We conclude that use of the comparable sales method was error and that the wastebeds and supporting facilities should have been valued as a specialty. We therefore reverse the order of the Appellate Division and remit the matter to Supreme Court for further proceedings.
The property consists of five wastebeds covering 868 acres surrounded by a buffer zone of approximately 155 acres consisting of sloping hillsides and wetlands. The wastebeds themselves resemble mesas ranging in height from 35 to 70 feet, with gravel dikes creating the walls of each structure. Allied’s predecessor began using the property in the early part of this century to receive waste material generated by its "solvay process” at a nearby industrial plant. Initially, the deposits were contained below ground. As these reservoirs became filled, Allied built the huge gravel dikes above ground to expand holding capacity. Other improvements on the property include a settling lagoon, fences, access roads, catwalks, piping and a pumphouse.
The waste material was delivered to the wastebed through a pipeline in the form of a slurry. Initially, the substance has a toothpaste-like consistency, but over a period of 20 to 25 years, the material is transformed into a solid. During this process, liquid from the waste leaches through the dikes and into the surrounding ditches, which then carry it to the settling lagoon. Even older wastebeds continue to leach, as rain and snow fall on the beds. The material is not classified as hazardous, although some asbestos was deposited at the site during dumping unrelated to the industrial process. Four of the five wastebeds are full; the parties agree that the fifth will receive no more deposits with the closing of Allied’s plant. The assessment on one of the wastebeds (No. 11) has not been challenged. The settling process was completed by 1988 and therefore it was valued as vacant land.
The Town’s assessor valued the wastebed facility as a specialty, using reproduction cost less depreciation. Three calculations were central to his analysis: the base land value, the value of the improvements and depreciation. He determined the base land value by using comparative sales of five properties: four sold for landfill use and the fifth purchased as a site for a petroleum farm. The value of improvements was taken from an engineer’s report projecting what it would cost to construct a new wastebed facility in 1990. Finally, to deter *355 mine depreciation, the assessor calculated the "total economic life” of each wastebed, a period of years that included both a bed’s "industrial life” — the period during which it was receiving deposits — and its "transitional life” — the period from the last deposit to the point when the land would be sufficiently firm to support an alternate use. He concluded that the transitional life was 55% of the total economic life. By using that figure in conjunction with data on the length of time each bed functioned as an active receiving facility, he was able to calculate the total economic life and then depreciate the cost of each wastebed over a period of years beginning with its initial deposit and concluding with the end of its transitional life. This methodology produced a value of $4,800 per acre for the facility as a whole.
Allied, which had evaluated the property at $60 to $400 an acre, instituted this proceeding to challenge that assessment. After trial, the court concluded that the Town’s use of the specialty valuation method constituted error because only an ongoing concern could be deemed a specialty. In the view of the court, the site had ceased to be used as a wastebed facility when Allied discontinued its industrial operation in 1986. However, because most of the land did not have sufficient consistency to support other foreseeable use for 20 to 25 years, Supreme Court found that the "highest and best use” of the buffer was largely as a recreational site and that the wastebeds had "no uses now.” The court employed a comparable sales approach and viewed the wastebed acreage as being similar to specified parcels of swampland. The wastebeds were valued at $166 to $250 per acre; the buffer zone at $570 to $600 per acre. The Appellate Division affirmed on the opinion of Supreme Court.
Allied’s property is a singular type with a novel past and uncertain future. Unlike the swampland that Supreme Court used as comparables to value the wastebeds, Allied has devoted the property to the deposit of waste, a use that is increasingly commonplace in an industrial society and one that frequently has long-term effects on the land. Not surprisingly, courts and local governments are now beginning to contend with the problem of fairly valuating environmentally damaged properties (see, Arnold, Appraising and Valuing Contaminated Properties, 16 ALI-ABA No. 4; Patchin, Valuation of Contaminated Properties, Jan. 1988 Appraisal Journal, at 7; Firestone Tire & Rubber Co. v County of Monterey, 223 Cal App 3d 382, 272 Cal Rptr 745; Inmar Assocs. v Borough of *356 Carlstadt, 112 NJ 593, 549 A2d 38). No finding of contamination of Allied’s wastebeds has been made, but many of the same economic considerations are present, most notably the "stigma” attached to environmentally damaged land in the eyes of any potential buyers, the risk that undetected or currently unclassified hazardous materials will be identified, and the costs of clean-up and rehabilitation. The particularized conditions of such properties make valuation difficult. In most instances, the comparable sales method is inappropriate, as it is in this case. We conclude that on the record the property should have been valued as a specialty (see, Matter of Brooklyn Union Gas Co. v State Bd. of Equalization & Assessment, 65 NY2d 472; Matter of Great Atl. & Pac. Tea Co. v Kiernan, 42 NY2d 236).
Analysis starts with recognition that while property must be assessed at market value, there is no fixed method for determining that value. The ultimate purpose of valuation, whether in eminent domain or tax certiorari proceedings, is to arrive at a fair and realistic value of the property involved so that all property owners contribute equitably to the public fisc. Any fair and nondiscriminating method that will achieve that result is acceptable (see, Matter of Great Atl. & Pac. Tea Co. v Kiernan, supra, at 240; Matter of Merrick Holding Corp. v Board of Assessors, 45 NY2d 538, 541; G.R.F., Inc. v Board of Assessors, 41 NY2d 512). The best evidence of value, of course, is a recent sale of the subject property between a seller under no compulsion to sell and a buyer under no compulsion to buy (see, Matter of Grant Co. v Srogi, 52 NY2d 496, 511). Absent that evidence, however, the courts have traditionally valued property by one of three methods: comparable sales, capitalization of income or reproduction cost less depreciation (Matter of Great Atl. & Pac. Tea Co. v Kiernan, 42 NY2d 236, 237-238, supra; see generally, Lee and LeForestier, Review and Reduction of Real Property Assessments in New York, ch 1 [3d ed]).
Evidence of comparable sales is generally the preferred measure of a property’s value for assessment, but where there is insufficient relevant data, value may be determined by other methods (Matter of General Elec. Co. v Town of Salina, 69 NY2d 730, 731; Matter of Great Atl. & Pac. Tea Co. v Kiernan, supra, at 242; Matter of Merrick Holding Corp. v Board of Assessors, supra). But even when alternative theories must be used, the courts have been cautious about applying the reproduction cost less depreciation method because it is *357 most likely to result in overvaluation, given its tendency to ascribe too little weight to such factors as rising construction costs and diminishing value by functional obsolescence (G.R.F., Inc. v Board of Assessors, supra, at 514). Accordingly, we have limited its use to properties deemed "specialties,” those properties that are "uniquely adapted to the business conducted upon [them] or use made of [them] and cannot be converted to other uses without the expenditure of substantial sums of money” (Matter of Great Atl. & Pac. Tea Co. v Kiernan, supra, at 240 [italics in original]; see also, Matter of County of Nassau [Colony Beach Club], 43 AD2d 45, 49, affd 39 NY2d 958). Such properties, because of their use, have no easily ascertainable market value (see, Matter of Brooklyn Union Gas Co. v State Bd. of Equalization & Assessment, 65 NY2d 472, 485, supra).
There are generally four criteria for determining whether a specialty exists: (a) the improvement must be unique and must be specially built for the specific purpose for which it is designed; (b) there must be a special use for which the improvement is designed and the improvement must be so specially used; (c) there must be no market for the type of property and no sales of property for such use; and (d) the improvement must be an appropriate improvement at the time of the taking or assessment and its use must be economically feasible and reasonably expected to be replaced (Matter of County of Suffolk [C. J. Van Bourgondien, Inc.] 47 NY2d 507, 511-512, supra, quoting Matter of County of Nassau [Colony Beach Club] supra). Applying those criteria, Supreme Court rejected the Town’s characterization of the wastebed facility as a specialty because it was no longer being "specially used” and because it was not "appropriate” and "economically feasible.”*
The rejection of the Town’s specialty argument, like Allied’s argument that the facility is 100% functionally depre *358 ciated, was premised on the assumption that the wastebeds’ sole purpose was receiving waste from Allied’s industrial operation. The record demonstrates, however, that the waste-beds’ primary purpose is retaining waste after receiving it and holding it until the solidification process has run its course. In that function, the wastebeds are no different from warehouses or storage silos that have become filled to capacity. They continue to be used even though no new material is being added and, contrary to Allied’s claim, they are not 100% functionally depreciated by virtue of the fact that new material is not being added. The site’s design, which includes a system of ditches and a settling lagoon that remain fully operational, makes plain Allied’s intention to create a specialized storage and solidification operation with a long-term lifespan — a lifespan dictated by the settling process itself, not by the cessation of waste delivery to the site. As Supreme Court found in reviewing the valuation of the settling lagoon, four of the wastebeds are still leaching and will continue to leach "for years to come.” The improvements on the property were obviously made specially in contemplation of that ongoing process.
We need not determine the point at which the settling process will have ceased and the site’s use ended. It is enough to find that on the taxable status dates relevant here, March 1, 1987, and March 1, 1988, the wastebeds continued to be "specially used.” Allied asserts that by 1987 the beds contained solid materials, an assertion apparently made to buttress the conclusion that the wastebeds are no longer functioning as retainers. Neither the factual premise nor the conclusion is supported by the record, however. Supreme Court described new deposits as being like toothpaste and found that even after 20 to 25 years any construction would have to be done on slabs. Moreover, Allied’s own appraiser testified that on the taxable status dates the property was so soft that it was not conducive to hiking.
But even if we accept Allied’s claim that the material has become a "solid,” the fact remains that walls of the wastebeds continue to hold a definable material undergoing a long-term process of leaching out and settling. The site is not merely earth or fill that has been contoured in a particular fashion and can now be recontoured by the next buyer; the wastebeds, to perform their function, must necessarily remain intact. Nor could Allied seriously argue that it had no continuing interest in 1987 and 1988 in maintaining, as a retaining and settling *359 facility, the wastebeds and the leachage system. Allied was required to store the waste somewhere — if not here, somewhere else. Indeed, Allied’s continuing interest in the property is evident from its preparation of an Environmental Impact Statement and work with the Department of Environmental Conservation to determine needed rehabilitation of the site.
Although the record does not disclose whether the company would have repaired in 1987 and 1988, or would repair now, a break in a wastebed wall or ditch that threatened the containment of the waste material or its run-off, a reasonable inference can be drawn that it would. Allied’s own appraiser was aware of the potential risks when he stated, "Today there is nothing known to exist in those wastebeds except for the asbestos deposited in specific locations that would indicate that any of the material would be classified as hazardous or toxic, but that doesn’t eliminate the possibility that some time in the future that could occur.” In its own self-interest, it would appear that Allied would have to maintain the beds until the leaching process was complete or nearly complete.
Supreme Court’s rejection of the specialty designation was also based on its finding that to be a specialty the improvements had to be "appropriate” and "economically feasible” under the fourth criterion for a specialty. The court having found that the wastebeds were not in use necessarily concluded that they also were not economically feasible or appropriate. Because the wastebeds were in use, however, and not 100% functionally depreciated on the taxable status dates, the facility was economically feasible and appropriate.
Allied argues that it should nonetheless prevail on this ground because the fourth criterion provides that "the improvement must be * * * reasonably expected to be replaced.” The company asserts that, with the industrial plant closed, there is no possibility of the wastebeds ever being replaced. Allied’s literal reading of the criterion gives it a meaning it was not intended to have in an assessment case.
The four-part criteria for a specialty were developed in eminent domain cases (see, Matter of County of Suffolk [C. J. Van Bourgondien, Inc.], 47 NY2d 507, supra; Matter of County of Nassau [Colony Beach Club], 43 AD2d 45, supra). In eminent domain, the issue of replacement is not speculative or hypothetical; the courts are interested in making certain that governments are not forced to pay the high valuations typically produced by the reproduction cost less depreciation *360 method if the use of the property is so unproductive or lacking in utility that the owner would likely discontinue the use on his own in the absence of the taking. However, when the "expected to be replaced” language is applied to assessment cases, it has little relevance for the simple reason that nothing is being taken away by an assessment action and therefore nothing is in need of replacement. Faced with a similar argument in Matter of Brooklyn Union Gas Co. v State Bd. of Equalization & Assessment (65 NY2d 472, 486-487, supra), we stated that the criterion referred not to reproduction of the specific improvements or structures but to continuation of the "use or function” in the event of some hypothetical act of destruction. The relevant consideration in assessment cases is the property’s value on the taxable status date — not its future use or value or the intentions of the owner. Accordingly, whatever vitality the criterion had previously enjoyed in eminent domain cases, it adds nothing to the analysis in assessment cases and was effectively curtailed by our opinion in Brooklyn Union Gas.
In sum, we conclude that use of the comparable sales method was error here, where there was ongoing use of the improvements and no ascertainable market. For the same reasons, we hold that Supreme Court, in determining an alternative method for setting fair market value, should have found on the record presented that the property was a specialty and used the reproduction cost less depreciation method.
Accordingly, the order appealed from should be reversed, with costs, and the matter remitted to Supreme Court, Onondaga County, for further proceedings in accordance with this opinion.
Judges Kaye, Titone, Hancock, Jr., Bellacosa and Smith concur.
Order reversed, etc.

 The court went on to conclude "[w]hat remains, then, is the land only since a specialty applies only to buildings and improvements.” The statement should not be read, as Allied advocates, for the proposition that because the wastebeds are not buildings they cannot qualify as specialties. The court was restating its belief that no use was being made of the property and therefore a specialty designation did not apply. While land alone cannot be a specialty, improvements to land can justify a finding that a property is a specialty (Albany Country Club v State of New York, 19 AD2d 199, 201, affd 13 NY2d 1085 [golf course improvements valued by the specialty valuation method]).