OPINION OF THE COURT
 

 Ciparick, J.
 

 In these consolidated tax certiorari proceedings, petitioner Commerce Holding Corp. seeks a reduction of the assessed value of its property by the Board of Assessors and the Board of Assessment Review of the Town of Babylon.
 
 [1]
 
 The main point of contention is whether environmental contamination should be considered in valuing Commerce’s property for tax purposes. Because environmental contamination can depress a parcel’s true value, we hold that it must be considered in assessing real property tax. In addition, we review the methodology by which environmental contamination may be measured and uphold the valuation of Commerce’s property by the reviewing court.
 

 I.
 

 Commerce owns a parcel of industrial property in the Town of Babylon in Suffolk County. The property, purchased by Commerce in 1984, consists of 2.7 acres of land improved with a one-story industrial building that is presently divided into 37 rental units. A former tenant of the property performed metal plating operations on the premises and discharged wastewater
 
 *728
 
 containing copper, lead, cadmium, zinc and other metals into on-site leaching pools, ultimately resulting in severe subsurface contamination.
 

 As a result of the contamination, the subject property was designated a Superfund site in 1986, pursuant to the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) (42 USC § 9601
 
 et seq.),
 
 making the owner of the property strictly liable for the cleanup costs (42 USC § 9607 [a]). In 1988, Commerce entered into a consent order with the Environmental Protection Agency to remediate the site.
 

 From 1986 to 1991, assessors for the Town valued Commerce’s property at between $1.5 million and $2.6 million each year. Commerce filed timely challenges to each yearly assessment on the ground of excessive valuation, contending that the assessors should have reduced the assessed property value to account for environmental contamination. Commerce thereafter instituted timely annual tax certiorari proceedings pursuant to RPTL article 7, later consolidated, to review the assessments for tax years 1986-1987 through 1991-1992.
 

 In a hearing before Supreme Court, real estate experts for both Commerce and the Town primarily used the income capitalization method to determine the value of the property as if unaffected by contamination, and then subtracted a cost to cure from that value. Specifically, Commerce’s expert valued the property by using an income capitalization approach, with a sales approach for the land only, and then subtracted from the property’s value in each year the total remaining cost to cure all the contamination. The outstanding cost to cure was calculated in 1991 dollars, trended back to account for inflation in each of the prior years, and reduced by any sums actually spent on remediation that particular year.
 
 [2]
 
 By contrast, the Town’s expert valued the property in an uncontaminated state based on comparable sales data "blended” with an income capitalization approach, and then subtracted from the property’s value only the amount actually expended by Commerce in the year the costs were incurred.
 

 Supreme Court adopted Commerce’s analysis in its entirety. The court concluded that Commerce’s base value was more accurate in view of the "weakness of comparable sales in the
 
 *729
 
 area” and subtracted from that value the total remaining cost to cure the contamination in each year. The Appellate Division affirmed
 
 (see, Matter of Commerce Holding Corp. v Board of Assessors,
 
 216 AD2d 466). This Court granted the Town’s motion for leave to appeal and we now affirm.
 

 II.
 

 The cardinal principle of property valuation for tax purposes, set forth in the State Constitution, is that property "[assessments shall in no case exceed full value” (NY Const, art XVI, § 2;
 
 see, Grant Co. v Srogi,
 
 52 NY2d 496, 512). As this Court has stated, the "ultimate purpose of valuation * * * is to arrive at a fair and realistic value of the property involved”
 
 (Matter of Great Atl. & Pac. Tea Co. v Kiernan,
 
 42 NY2d 236, 242).
 

 The concept of "full value” is typically equated with market value, or what "a seller under no compulsion to sell and a buyer under no compulsion to buy” would agree to as the subject property’s price
 
 (Matter of Allied Corp. v Town of Camillus,
 
 80 NY2d 351, 356). In view of this market-oriented definition of full value, the assessment of property value for tax purposes must take into account any factor affecting a property’s marketability
 
 (accord,
 
 RPTL 302 [1] ["The taxable status of real property * * * shall be determined annually
 
 according to its
 
 condition”] [emphasis added]). It follows that when environmental contamination is shown to depress a property’s value, the contamination must be considered in property tax assessment
 
 (see,
 
 Lee and LeForestier, Review and Reduction of Real Property Assessments in New York § 8.11, at 73 [3d ed 1996 Cum Supp]).
 

 The Town nevertheless asks this Court to adopt a per se rule barring any assessment reduction for environmental contamination. Otherwise, the Town contends, polluters would succeed in shifting the cost of environmental cleanup to the innocent taxpaying public in contravention of the public policy of imposing remediation costs on polluting property owners and their successors in title.
 
 [3]
 

 Whatever the merits of the Town’s argument, the "full value” requirement is a constitutional mandate that cannot be
 
 *730
 
 swept aside in favor of the asserted environmental policy. As the State Board of Equalization and Assessment has recognized, the public policy "argument, while possessing superficial appeal, runs afoul of the requirement found in * * * New York’s Constitution, that real property may not be assessed at more than its full (fair market) value” (9 Opns Counsel SBEA No. 58, at 113 [citing NY Const, art XVI, § 2]). The high courts of Massachusetts and New Jersey have ruled likewise, concluding that statutory and constitutional full value requirements cannot be subordinated to environmental policy concerns
 
 (see, Reliable Elec. Finishing Co. v Board of Assessors,
 
 410 Mass 381, 382-383, 573 NE2d 959, 960-961;
 
 Inmar Assocs. v Borough of Carlstadt,
 
 112 NJ 593, 600-601, 549 A2d 38, 41-42;
 
 see also, Firestone Tire & Rubber Co. v County of Monterey,
 
 223 Cal App 3d 382, 391-392, 272 Cal Rptr 745, 750-751).
 

 Thus, in response to the Town’s contention that assessment reductions for environmental contamination will encourage landowners to delay remediating their property, this policy argument cannot eviscerate the constitutional directive. Moreover, the Town’s concern appears to be overstated; whatever tax benefit Commerce might obtain by deferring implementation of remedial measures pales in comparison to Commerce’s potential liability for failure to take appropriate remedial action, including severe penalties under CERCLA
 
 (see,
 
 42 USC § 9607 [c] [3]) and $2,000 in daily penalties for noncompliance with the consent order.
 

 We also reject the Town’s argument that because Commerce, by consent order, has agreed to pay the cleanup costs even if it sells the property, the property’s market value would be unaffected by the presence of contamination. This contention is belied by the reality that a purchaser of the site, on notice of the environmental contamination, nevertheless would be liable for the cleanup costs under CERCLA
 
 (see,
 
 42 USC § 9607 [a]). Moreover, that Commerce has agreed to remediate the property does not resolve the question of whether, and to what extent, the contamination in fact affects the value of the land
 
 (see, Firestone Tire & Rubber Co.,
 
 223 Cal App 3d, at 392, 272 Cal Rptr, at 750-751,
 
 supra).
 
 As Commerce’s expert opined, a buyer of the property would have demanded an abatement in the purchase price to account for the contamination notwithstanding the existence of the consent order
 
 (see, Matter of Northville Indus. Corp. v Board of Assessors,
 
 143 AD2d 135, 138). Whether a property owner’s agreement to pay the cleanup costs would affect the property’s value in a given case is a
 
 *731
 
 factual matter for the assessment board
 
 (cf., Fjetland v Brown,
 
 1990 WL 311252, at *5 [Wash Bd Tax App]), but it cannot be said, as a matter of law, that the existence of the consent order in this case precluded an assessment reduction.
 

 III.
 

 We next consider the methodology by which the value of Commerce’s contaminated property was assessed. The Town argues that it was legal error to deduct from the value of the property in an uncontaminated state the total remaining cleanup costs in each year, as compared with the actual amount expended in each year. Based on the record in this case, we disagree.
 

 In reviewing an assessment of property value, we are guided by the precept that "while property must be assessed at market value, there is no fixed method for determining that value * * *. Any fair and nondiscriminating method that will achieve that result is acceptable”
 
 (Matter of Allied Corp. v Town of Camillus,
 
 80 NY2d 351, 356,
 
 supra).
 
 Flexibility is especially important in the valuation of contaminated properties, for which there has yet to emerge any single generally accepted valuation methodology.
 

 The difficulty in assessing a polluted parcel of property stems from the uniqueness of environmental contamination
 
 (see,
 
 Wilson,
 
 The Environmental Opinion: Basis for an Impaired Value Opinion,
 
 Appraisal J, July 1994, at 411 ["Each environmental impairment to value is as unique as a fingerprint”]). Regardless of the traditional valuation technique selected by the assessor — comparable sales, capitalization of income, or reproduction cost — each is inevitably hampered to some extent by the lack of available market data. Recognizing the unsuitability of the strict application of traditional valuation techniques to contaminated properties, the prevailing trend in this field has been one of experimentation and adaptation, marked by the use of traditional techniques adjusted for environmental contamination
 
 (see generally,
 
 Lewandrowski,
 
 Toxic Blackacre: Appraisal Techniques & Current Trends in Valuation, 5
 
 Alb LJ Sci & Tech 55;
 
 see also, Westling v County of Mille Lacs,
 
 512 NW2d 863, 867 [Minn] [Keith, Ch. J., concurring]). We endorse this flexible approach
 
 (see, G.R.F., Inc. v Board of Assessors,
 
 41 NY2d 512, 515 ["Pragmatism * * * requires adjustment when the economic realities prevent placing * * * properties in neat logical valuation boxes”]), but caution that a challenge to a property tax assessment must be
 
 *732
 
 supported, by sound theory and objective data
 
 (see, Matter of Katz v Assessor of Vil./ Town of Mount Kisco,
 
 82 AD2d 654, 656-657).
 
 [4]
 

 While it is not possible to prescribe any one method to assess the effects of environmental contamination, there are certain factors that should be considered. These include the property’s status as a Superfund site, the extent of the contamination, the estimated cleanup costs, the present use of the property, the ability to obtain financing and indemnification in connection with the purchase of the property, potential liability to third parties, and the stigma remaining after cleanup
 
 (see generally,
 
 Patchin,
 
 Valuation of Contaminated Properties,
 
 Appraisal J, Jan. 1988, at 7; Wilson,
 
 op. cit.;
 
 Chalmers and Roehr,
 
 op. cit.).
 

 Against this backdrop, we cannot say that the methodology here employed was erroneous as a matter of law. The valuation of Commerce’s property was accomplished by the use of the income capitalization approach to determine the value in an uncontaminated state of this income-producing property, combined with a downward environmental adjustment in the amount of outstanding cleanup costs. While cognizant of the potential of this valuation method to overstate the effects of environmental contamination,
 
 [5]
 
 we nevertheless conclude that cleanup costs are an acceptable, if imperfect, surrogate to quantify environmental damage and provide a sound measure of the reduced amount a buyer would be willing to pay for the contaminated property
 
 (see, Westling v County of Mille Lacs,
 
 543 NW2d 91 [Minn] [affirming assessment where value of property reduced by remaining cleanup costs
 
 and
 
 amount attributable to stigma]; Wilson,
 
 op. cit.,
 
 at 413;
 
 cf., Matter of Northville Indus. Corp. v Board of Assessors,
 
 143 AD2d 135, 138,
 
 supra
 
 [deducting total cost of compliance with Sanitary Code from each annual tax assessment];
 
 Matter of Bass v Tax Commn.,
 
 179 AD2d 387, 388 [affirming deduction for "foresee
 
 *733
 
 able cost of curing the building’s deficiencies,” including asbestos contamination]).
 

 The Town next argues that even if the entire remaining cost to cure was properly deducted in connection with each yearly assessment, this amount should have been discounted to its present value. However, Commerce’s expert testified that the estimated cleanup costs
 
 were
 
 present value estimates, which he described as the present financial impact of the cleanup on the property’s value. The Town failed to introduce any controverting evidence and its challenge is thus precluded.
 

 In conclusion, we hold that based on the record in this case, the reviewing court properly considered the effects of environmental contamination in assessing the value of Commerce’s property and applied an acceptable valuation technique.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa, Smith and Levine concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . Appearing as
 
 amici curiae
 
 in support of the Town are the City of New York, New York State Conference of Mayors and Municipal Officials, Association of Towns of the State of New York, County of Nassau, City of Buffalo, and City of Syracuse.
 

 [2]
 

 . Commerce’s expert estimated that the total cost of remediation in then current 1991 dollars would be $925,365, and projected that the cleanup would be completed in 8 to 10 years.
 

 [3]
 

 . Although the Town attempts to frame its policy argument in terms of environmental culpability — the guilty polluter versus the innocent taxpaying public — it should be recognized that CERCLA is a strict liability statute that imposes liability on property owners such as Commerce without regard to fault (see, 42 USC § 9607 [a] [responsible party
 
 and
 
 owner are liable]).
 

 [4]
 

 . New valuation techniques are being developed that hold promise for the valuation of contaminated properties (see,
 
 e.g.,
 
 Chalmers and Roehr,
 
 Issues in the Valuation of Contaminated Property,
 
 Appraisal J, Jan. 1993, at 36-38 [discussing regression analysis and contingent valuation methodology]).
 

 [5]
 

 . The use of this method would be disfavored, for example, when the property is capable of productive use, but the high cleanup costs yield a negative property value. In such a case, the cleanup costs could be more appropriately accounted for by adjustments to the projected income stream (see,
 
 e.g.,
 
 Mundy,
 
 The Impact of Hazardous and Toxic Material on Property Value: Revisited,
 
 Appraisal J, Oct. 1992, at 463).