Matter of Colonie Ctr. v Town of Colonie (2022 NY Slip Op 06045)

Matter of Colonie Ctr. v Town of Colonie

2022 NY Slip Op 06045

Decided on October 27, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 27, 2022

533792
[*1]In the Matter of Colonie Center, by its Agent, Huff Wilkes, L.L.P., Appellant,
v
Town of Colonie et al., Respondents. (And Two Other Related Proceedings.)

Calendar Date:September 9, 2022

Before:Garry, P.J., Egan Jr., Lynch, Clark and Ceresia, JJ.

Herman Katz Cangemi Wilkes & Clyne, LLP, Melville (Kevin M. Clyne of counsel), for appellant.
Vincelette Law Firm, Latham (Daniel G. Vincelette of counsel), for Town of Colonie, respondent.
Tabner, Ryan & Keniry, LLP, Albany (William F. Ryan Jr. of counsel), for South Colonie Central School District, respondent.

Garry, P.J.
Appeal from an order and judgment of the Supreme Court (Margaret T. Walsh, J.), entered June 28, 2021 in Albany County, which dismissed petitioner's applications, in three proceedings pursuant to RPTL article 7, to reduce the 2017, 2018 and 2019 tax assessments on certain real property.
The subject property, tax parcel number 42.3-1-2 in the Town of Colonie, Albany County, includes the majority of an enclosed shopping mall known as Colonie Center.[FN1] For the 2017, 2018 and 2019 tax years, the market value of the property was determined to be $96,296,296, $97,744,361 and $101,167,315, respectively, resulting in assessed values of $65,000,000 for each year.[FN2] Petitioner commenced these RPTL article 7 proceedings seeking reductions of those assessments. At the ensuing nonjury trial, petitioner presented, among other evidence, the testimony and report of an expert appraiser who estimated market values for the property to be $72,200,000, $68,000,000 and $64,000,000 for the subject tax years, respectively. Respondents Town of Colonie, Town Assessor and Board of Assessment Review (hereinafter collectively referred to as the Town respondents)[FN3] presented the testimony and report of an expert appraiser who valued the property at $98,564,000, $100,087,000 and $101,894,000. After partially granting petitioner's motion to strike the Town respondents' appraisal for certain noncompliance with 22 NYCRR 202.59 (g) (2), Supreme Court determined that petitioner failed to prove that the property was overvalued for the subject tax years and accordingly dismissed the petitions. Petitioner appeals.
There is no dispute that petitioner met its threshold burden of establishing a prima facie valuation issue through a competent appraisal (see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d 179, 187-188 [1998]; Matter of Cohoes Falls L.P. v Board of Assessment Review, 195 AD3d 1126, 1127 [3d Dept 2021]). Thus, our task is to "weigh the entire record, including evidence of claimed deficiencies in the assessment, to determine whether petitioner has established by a preponderance of the evidence that [the] property has been overvalued" (Matter of Roth v City of Syracuse, 21 NY3d 411, 417 [2013] [internal quotation marks and citation omitted]; see Matter of Foxcroft Vil., LLC v Town Assessor of the Town of Fallsburg, 176 AD3d 1527, 1529 [3d Dept 2019]).
The goal of property valuation for tax purposes is to arrive at the "full value" of the property (NY Const, art XVI, § 2; see Matter of Great Atl. & Pac. Tea Co. v Kiernan, 42 NY2d 236, 239 [1977]), which is "typically equated with market value" (Matter of Commerce Holding Corp. v Board of Assessors of Town of Babylon, 88 NY2d 724, 729 [1996]; see Matter of Allied Corp. v Town of Camillus, 80 NY2d 351, 356 [1992]). It is well settled that "[t]he best evidence of value . . . is a recent sale of the subject property between a seller under no compulsion to sell and a buyer under no compulsion to buy" (Matter of Allied [*2]Corp. v Town of Camillus, 80 NY2d at 356; see Matter of Saratoga Harness Racing v Williams, 91 NY2d 639, 643 [1998]). Nonetheless, in arriving at his valuations, petitioner's expert, Edward Williams, discounted a concededly arm's length sale of the subject property for $106,574,600 in April 2013. We agree with Supreme Court that the transaction was temporally relevant (see e.g. Matter of Rite Aid Corp. v Haywood, 130 AD3d 1510, 1511-1515 [4th Dept 2015], lvs denied 26 NY3d 915, 916 [2016], cert denied ___ US ___, 137 S Ct 174 [2016]; Matter of Rite Aid Corp. v Otis, 102 AD3d 124, 125-127 [3d Dept 2012], lv denied 21 NY3d 855 [2013]) and that Williams failed to demonstrate that it was in any way abnormal (see W.T. Grant Co. v Srogi, 52 NY2d 496, 511 [1981]; Matter of Weslowski v Assessor of City of Schenectady, 152 AD3d 1035, 1036-1037 [3d Dept 2017]). Williams therefore erroneously disregarded compelling evidence of the property's fair market value for the years under review; this significantly undermined his dramatically lower valuations (see Matter of Rite Aid Corp. v Haywood, 130 AD3d at 1514-1515; Matter of Rite Aid Corp. v Otis, 102 AD3d at 127; Matter of Eckerd Corp. v Gilchrist, 44 AD3d 1239, 1240-1241 [3d Dept 2007], lv denied 10 NY3d 707 [2008]; cf. Matter of Highbridge Dev. BR, LLC v Assessor of the Town of Niskayuna, 121 AD3d 1324, 1327-1328 [3d Dept 2014]).
Of course, a property may be valued without evidence of a recent sale (see Matter of Saratoga Harness Racing v Williams, 91 NY2d at 643). To that end, both Williams and the Town respondents' appraiser, Kenneth Gardner, utilized the income capitalization approach to determine the fair market value of the property. This method is well recognized as the best approach for valuing income-producing property such as shopping malls (see Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau, 45 NY2d 538, 542 [1978]; Matter of Champlain Ctr. N. LLC v Town of Plattsburgh, 165 AD3d 1440, 1443 [3d Dept 2018]; Matter of Sangertown Sq., L.L.C. v Assessor of Town of New Hartford, 118 AD3d 1344, 1344 [4th Dept 2014], lv denied 24 NY3d 907 [2014]; Matter of VGR Assoc., LLC v Assessor, Bd. of Assessment Review of Town of New Windsor, 51 AD3d 678, 679 [2d Dept 2008]). "The income capitalization approach requires an appraiser to formulate a value estimate for the property by converting projected net income into a single present value. To do so, the market rent for the subject property must be estimated and then, from available market data, the appraiser must estimate a property allowance for vacancy and credit loss forecast to occur during the period of ownership. Further estimating and projecting anticipated fixed and operating expenses during the ownership, the appraiser is last left to select and apply an appropriate capitalization rate" (Matter of New Cobleskill Assoc. v Assessors of Town of Cobleskill, 280 AD2d 745, 746 n [3d Dept 2001], lv denied 96 NY2d 715 [2001]).
Initially[*3], both experts agree that valuation of a shopping mall must begin with classification or "grading" of the mall, which will impact the selection of comparable properties and a capitalization rate that best reflects future risks. Both experts placed Colonie Center within the broader "B" classification when considering certain sales. Williams ultimately concluded that Colonie Center was a "B to B-" mall based upon other physical and economic attributes and risk factors — notably, Colonie Center's proximity to and direct competition with Crossgates Mall and the duplication of Colonie Center's anchor stores in the market. Williams also acknowledged, however, that the property had recently undergone substantial renovations; that certain stores, such as Whole Foods and the Cheesecake Factory, while not anchor stores, drive significant traffic to the mall; and that the mall housed a number of stores that were the only one of their kind in the Capital Region, such as L.L. Bean and Nordstrom Rack. Gardner ultimately classified Colonie Center as a "B+" mall, with some aspects approaching the "A" category. He acknowledged the risk of Colonie Center losing an anchor store but emphasized the property's updated appearance, particularly in comparison to Crossgates, as well as its increasing sales, high rates of occupancy, new leasing activity and an increasing area population that can support a high-performing mall.
Turning to income, actual income is well regarded as the best indicator of value when undertaking an income capitalization approach (see Matter of Brookdale Senior Living Solutions & Meriweg Latham LLC v Town of Colonie Bd. of Assessment Review, 186 AD3d 1801, 1803 [3d Dept 2020], lv denied 37 NY3d 902 [2021]; Matter of Village Sq. of Penna, Inc. v Board of Assessment Review of the Town of Colonie, 123 AD3d 1402, 1404 [3d Dept 2014], lv denied 25 NY3d 903 [2015]), although adjustments may be made where the actual income does not reflect full value (see Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau, 45 NY2d at 543; Matter of Center Albany Assoc. LP v Board of Assessment Review of the City of Troy, 151 AD3d 1420, 1423 [3d Dept 2017]). A major point on which the two experts differed was their methods for estimating market rents — "the rental income that a property would most probably command in the open market" (Matter of Saratoga Harness Racing v Williams, 91 NY2d at 644 [internal quotation marks and citation omitted]).
Here, income and expenses statements reveal that the property's actual effective gross income for the years under review was $18,423,688, $19,305,428 and $19,517,883, respectively.[FN4] Williams concluded that, if the property were free of encumbrances, it would not generate near $19 million, instead attributing $14,430,489 as potential gross revenue for each year. Guided by generalized, national trends, Williams rejected actual rents in exchange for averages of recent leasing activity within Colonie Center, which [*4]he viewed as its own submarket. This included new leases entered into from 2012 through 2018 and leases that were renewed from 2015 to 2018, collectively representing 42 tenancies and approximately 184,000 square feet of the approximately 760,000 square feet of leasable area. To test his market rents, Williams turned to unidentified comparables, in violation of 22 NYCRR 202.59 (g) (2). He also selectively declined to utilize market rents from those comparables where they were found to be higher than his estimates. Supreme Court credited Gardner's testimony that an average of new leases is not indicative of property value as a whole for a number of reasons, including that preferred locations, which demand higher rents, are often not available to rent. In terms of lease renewals, Gardner explained that the reasons for a tenant's willingness to pay a particular rent vary and that renewing a major tenant at a reduced rent often benefits the mall as a whole. He also credibly testified that in-place leases are routinely modified or adjusted throughout their terms, undermining Williams' assertion that long-standing leases cannot be considered reflective of market value. More to the point, the record reveals that total rents collected at the subject property increased during the subject tax years.
The experts also differed in their treatment of tenant concessions or allowances — "amounts necessary to entice tenants to lease property, such as paying store build-out expenses" (Matter of Champlain Ctr. N. LLC v Town of Plattsburgh, 165 AD3d at 1444). In Williams' view, tenant concessions have the effect of reducing rents and indicate that market rent is depressed. We agree with Supreme Court that Gardner more appropriately considered tenant concessions in the context of overall operation expenses as concessions draw tenants and, in turn, drive mall traffic, again impacting the mall as a whole (see id.; Matter of VGR Assoc., LLC v Assessor, Bd. of Assessment Review of Town of New Windsor, 51 AD3d at 679-680; Matter of Myron Hunt/Shaker Loudon Assoc. v Board of Assessment Review for Town of Colonie, 6 AD3d 953, 955 [3d Dept 2004]).
We are not persuaded by petitioner's claim that Gardner's analysis amounted to a leased fee valuation. As noted above, reliance on actual rents can distort a fee simple valuation for a number of reasons (see Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau, 45 NY2d at 543; Matter of North Country Hous. v Board of Assessment Review for Vil. of Potsdam, 298 AD2d 667, 668-669 [3d Dept 2002]). Gardner made clear that he did not thoughtlessly adopt the value of existing leases, instead performing an occupancy cost ratio analysis to test those rents against the market. Utilization of an occupancy cost ratio — reflecting what tenants are willing to pay in total occupancy costs, such as base rent, real estate taxes and common area charges, as a percentage of their retail sales — is a recognized appraisal method for [*5]the valuation of shopping malls (see Matter of Champlain Ctr. N. LLC v Town of Plattsburgh, 165 AD3d at 1444; Matter of Sangertown Sq., L.L.C. v Assessor of Town of New Hartford, 118 AD3d at 1344-1345).
We also agree with Supreme Court that petitioner failed to establish that Gardner's analysis was fatally flawed for allegedly double counting certain rental income. In arriving at his stabilized income projections, Gardner included a line item for "specialty rent/other" in addition to projected market rent for "mall shops" and "major stores."[FN5] In petitioner's view, temporary tenants are counted as both specialty rent and market rent for mall shops. The general manager of Colonie Center indeed testified that specialty leasing income on the rent rolls included only temporary tenant income, but Gardner repeatedly made clear that specialty leasing was only one component of the challenged line item, and he offset any potential overlap by not considering income from either permanent or seasonal kiosks in his analysis. Moreover, the document on which Williams purportedly relied to segregate out specialty leasing income was not included in his report and was not permitted into evidence.
Next, as to mall occupancy, rent rolls reveal that actual mall occupancy during the years under review were 97.4%, 94.9% and over 99%, respectively. Williams attributed an overall stabilized mall occupancy of 84.15%, and we agree with Supreme Court that the source of that conclusion is unclear. To the extent that Williams looked to comparables for verification, his comparables were again unidentified. Moreover, several comparables were of a lesser grade than Colonie Center. Gardner found overall vacancy rates compatible with the rent rolls but, looking to competitive properties, conservatively attributed an overall stabilized vacancy rate of 10% for mall shops and 5% for major stores. The experts then converted their estimated occupancy or vacancy percentages into figures for vacancy and collection losses. In light of his lower market rents and occupancy rates, Williams' estimate of net operating income was $8,118,180 for each of the tax years under review, in comparison to the actual net operating incomes that were realized (exclusive of real estate taxes): $11,780,120, $12,190,467 and $12,377,532.
The experts were left to select and apply capitalization rates — "[t]he factor by which a property's likely net income is related to its value at any particular time" (Matter of Hempstead Country Club v Board of Assessors, 112 AD3d 123, 136 [2d Dept 2013] [internal quotation marks and citation omitted]). "[T]he capitalization rate should be a reflection of the market rate, that is, what the investment market requires in return from a property of the age, kind, condition, and location as the subject property" (Matter of Cohoes Falls L.P. v Board of Assessment Review, 195 AD3d at 1128 [internal quotation marks, ellipsis and citation omitted]).
Williams found that, over the [*6]subject tax years, capitalization rates were rising due to the increasing risk in the mall investment market, again relying on only national trends and failing to consider any variables specific to the subject property. We agree that this renders his selection of a capitalization rate — "a crucial variable since small differences in it are magnified when net income is converted to capital value" (Shore Haven Apts. No. 6 v Commissioner of Fin. of City of N.Y., 93 AD2d 233, 236 [2d Dept 1983]; accord Matter of Cohoes Falls L.P. v Board of Assessment Review, 195 AD3d at 1128) — unreliable. In contrast, Gardner considered regional trends, and he concluded that Capital District malls, and retailers generally, were performing better than their national counterparts. Considering the quality of tenants, increasing rents, low occupancy costs and vacancy rates and stable tenant sales, Gardner attributed an 8.5% capitalization rate for each year.
We reject petitioner's claim that Gardner's report contains an inadequate factual basis for that rate. As previously noted, Supreme Court partially granted petitioner's posttrial motion and struck a table in Gardner's report due to his failure to include some of its underlying sources; therein, Gardner had summarized published data on overall trends in capitalization rates. However, Gardner testified that said table was predominately offered for the purpose of illustrating that an appropriate capitalization rate for a shopping mall must recognize mall grading. In any event, Gardner arrived at his capitalization rate by utilizing two different mortgage-equity calculations and an analysis of the April 2013 sale in addition to consulting published data — some of which was in fact included in his addenda and is consistent with his rate — and he ultimately selected the highest rate that these four methods generated, reflecting the most risk. We are similarly unpersuaded that Gardner's capitalization rate was speculative because his market analysis of the April 2013 sale utilized 2014 net operating income, which generated a corroborating capitalization rate of 7.9%.
For the reasons above, considering the record as a whole, we find no error in Supreme Court's rejection of Williams' appraisal and resultant dismissal of these proceedings.
Egan Jr., Lynch, Clark and Ceresia, JJ., concur.
ORDERED that the order and judgment is affirmed, without costs.

Footnotes

Footnote 1: In total, Colonie Center sits on approximately 91 acres of land and contains approximately 1,300,000 square feet of leasable area. Two of its anchor stores, Macy's and what was formerly Sears, are located on separate tax parcels and thus are not part of these proceedings. At issue is approximately 48 acres of land and approximately 760,000 square feet of leasable area.

Footnote 2: The dates of valuation for the subject tax years are July 1, 2016, July 1, 2017 and July 1, 2018, and the parties stipulated that the respective equalization rates were 67.50%, 66.50% and 64.25%.

Footnote 3: Respondent South Colonie Central School District intervened in these proceedings.

Footnote 4: Both experts' calculations of actual effective gross income also reflect increasing income. According to Williams, the effective gross income as of the subject valuation dates were $17,715,675, $18,502,775, $18,674,366, respectively. Gardner calculated those sums to be $18,423,687, $19,305,409, $19,517,882.

Footnote 5: Gardner's analysis separated gross leasable area into spaces that were under 10,000 feet (mall shops, kiosks and restaurants) and spaces over 10,000 square feet (major stores and anchor stores).