OPINION OF THE COURT
Dickerson, J.
Introduction
In this consolidated Real Property Tax Law article 7 proceeding, this Court must determine, among other things, the proper method by which to value certain real property. Specifically, we are asked to determine whether the trial court erred in adopting an “income capitalization” methodology rather than a “comparable sales” or market approach upon concluding that the subject property functions more akin to a cooperative corporation than a homeowners’ association.
The Property and the Club
The subject property consists of approximately 239 acres of land containing 283 seasonal cottages and other improvements, including a boat slip marina which can accommodate 153 boats. The property is situated on a single tax lot in Oakdale, Town of Islip, Suffolk County.
The petitioner, W.O.R.C. Realty Corp., was organized as a not-for-profit corporation for the purpose of holding title to the subject property and its common improvements for the benefit of its parent company, the West Oak Recreation Club, Inc., and the Club’s 283 members. The Club was formed in 1945 under *79 the former Membership Corporation Law, the predecessor to the Not-For-Profit Corporation Law, for the purpose of providing facilities for the recreation and enjoyment of its members and their families during the summer months and to promote social activities during the winter months. The Club is the sole shareholder of the petitioner and it functions for the benefit of its members, as does the petitioner.
Each of the 283 members of the Club owns one of the 283 cottages on the subject property. However, the owners do not hold title to the land upon which the cottages are situated.
When an individual wants to purchase a cottage, he or she negotiates with the present owner. Sale contracts are in a form prescribed by the Club’s board of directors. After the buyer and seller reach an agreement, the prospective purchaser then applies for membership in the Club, and, upon acceptance, the purchaser completes the transaction with the owner selling the cottage. Once the transaction is completed, the former owner surrenders his or her Club membership certificate, and a membership certificate is issued to the new owner. No deeds are issued because the dwellings are considered by the Club to be personal property. Since no land interest is conveyed, the cottages cannot be purchased with the proceeds of a mortgage loan. Additionally, due to the nature of this sales procedure, the sales are not publicly recorded.
All members are required to abide by the petitioner’s bylaws. The bylaws, among other things, restrict construction to 800-square-foot cottages. The bylaws permit the owners to demolish their cottages and construct new ones, or to move a cottage off of the premises and replace it, with the approval of the Club’s board of directors. Members are not permitted to rent or lease their cottages.
The Club collects dues from the cottage owners, and provides staff and services such as lifeguards, gate personnel, maintenance, and recreational events. The Club also collects fees for the use of the boat slips at the marina, at a rate of $35 per slip per season. The petitioner is entrusted with the maintenance of the facilities and common improvements, and pays the real property taxes, which are assessed against the petitioner rather than the individual Club members. Funds for paying the real property taxes are remitted by the Club members through their Club dues.
*80 The Town of Islip’s Classification of the Subject Property
As indicated on the tax bills dating from 1990/1991 through 2004/2005, the Town of Islip has classified the subject property as “non-homestead” property within the meaning of RPTL 1901.
The subject property is located within an “AAA” District. Among the permitted uses in an AAA District are single-family detached dwellings, churches or similar places of worship, public schools, public libraries, municipal buildings, municipal parks, railway rights-of-way or passenger stations, and agricultural or nursery uses (see Code of the Town of Islip § 68-45). Cooperative housing is not enumerated as a permitted use in an AAA District (id.). The cottages are permitted to occupy the subject parcel by permission from the Town of Islip Zoning Board of Appeals as a use permitted through a five-year renewable camping permit.
During the Town’s last reassessment, data was entered onto property record cards for each of the cottages on the subject property in existence at the time. The property record cards for each cottage indicated the same Suffolk County Tax Map District, section, and block, but an internal lot designation was provided for each cottage. Each cottage owner had exclusive use of an assigned plot. The petitioner maintains a sketch of the overall parcel depicting each plot. The Town’s property record cards for each of these internal lots classified each cottage as a “Property Class 260” or “seasonal residence,” and not as a condominium or cooperative apartment.
The Petition and the Trial
The petitioner commenced the instant proceeding pursuant to RPTL article 7 to challenge the real property tax assessment of the tax lot by the Board of Assessors and the Board of Assessment Review of the Town of Islip (hereinafter together the appellants), for the tax years 1992/1993 through 2004/2005. A nonjury trial was conducted over the course of 18 days between September 2005 and March 2008.
The Petitioner’s Case
The Petitioner’s Appraiser
The petitioner’s appraiser, Michael Haberman, had experience appraising seasonal facilities similar to the subject property, and his written appraisal was admitted into evidence. Haberman testified that the subject property was similar to a *81 cooperative form of ownership in the following ways: the entire 239 acres constituted one tax lot; common areas of the property were maintained by the “cooperative board,” or in this case, the Club; stock in the form of membership certificates was issued to the residents in order for them to occupy the cottages; members needed approvals by different boards in order to make changes to their cottages; and cottage sales, in effect, had to be approved by the Club’s board of directors, as that board had to approve the buyer for Club membership, which would not be a consideration for someone owning a cottage in fee.
Haberman’s method of valuation was primarily the “income capitalization” approach, pursuant to which he treated the property as though it “hypothetically functioned as a rental apartment complex.”[1] Haberman described his methodology, stating:
“The first thing we did was establish an economic rental pattern. And, we accomplished that by doing research for houses that physically appear to be similar to the cottages. We were able to find 15 leases throughout Suffolk County . . . [W]e were able to analyze these rentals to get to a unit for comparison basis, and in this particular case these leases were analyzed on a monthly rent per room basis. And, then we made appropriate adjustments, removal of dissimilarities, to derive what is known as an economic rent which was then trended ... for all years at issue, applied to the subject property, resulting [in] a potential gross income estimate from which reserve for vacancies and operating expenses were deducted, and resulting with a net operating income which was then capitalized to a value conclusion.”
Haberman obtained information on his rental comparables through the Multiple Listing Service, listing agents, and lessors and lessees. The comparables were located in Sayville, Sound Beach, Shirley, Patchogue, Wading River, Bayport, West Sayville, and East Moriches. They were properties that were either waterfront, water view, or near the water. The number of rental comparables included one for 1992, none for 1993, one for 1994, one for 1995, none for 1996, one for 1997, one for 1998, one for 1999, three for 2000, one for 2001, one for 2002, one for 2003, *82 two for 2004, and one for 2005.[2] Haberman’s valuation included applying expenses, which he derived from an analysis of operating expenses of apartment complexes located in Nassau County. Expenses applied included items such as payroll for maintenance crews and repairs.
None of the expense comparables considered by Haberman was located in a seasonal gated community such as the subject property, with private pools, a marina, and a private beach. In fact, they were not located in close proximity to Great South Bay. Some of them were rent-stabilized, although the subject property was not. Haberman’s expense comparables were equipped with elevator structures, although the subject property was not so equipped. Haberman explained that he used data from Nassau County as opposed to Suffolk County for expense comparables because he had more data from Nassau County. According to Haberman, Suffolk County yielded less information in terms of the number of buildings and the number of years for which data was available.
Haberman testified that, when compiling his expense data, he used financials from the petitioner realty company and the Club. He combined the expenses from these two corporations even though they were separate entities, and only one is a party to this proceeding, and notwithstanding the fact that none of his expense comparables incorporated the expenses of a parent corporation.
Haberman valued the docking facility using the actual reported income derived from dues for the use of the boat slips, in the total sum of $5,000 to $6,000 per year. Cottage ownership does not necessarily guarantee access to a boat slip in the marina. In fact, there was a three-year waiting list among residents for a boat slip. Haberman did not compare the marina *83 in the subject property with other marinas in his valuation because, in his view, the dock at the subject property was merely “a tie-up facility.” He explained that the dock did not have the features typically found in other marinas, such as electricity, repair services, or a fueling station. Referring to a photograph of the marina, Haberman testified that a majority of the boats docked at the marina were between 20 and 30 feet in length.[3]
Haberman admitted there were no stock transfers, and no transfer taxes paid, in connection with cottage sales. He also noted that there were no proprietary leases, no prospectus, and no offering statement. He further noted that, when a cooperative form of ownership is employed, the real estate taxes are passed through to the cooperative owners. In contrast, here, the petitioner was the entity that used the real estate taxes as a deduction, not the cottage owners. Nonetheless, in Haberman’s opinion, the petitioner was more analogous to a cooperative corporation than a homeowners’ association. Haberman noted that, in a cooperative form of ownership, major structural repairs are paid for by the cooperative. Here, the cottage owners made their own repairs.
Haberman concluded, according to his appraisal, that the subject property was overassessed by specified amounts for the years under review.
The Appellants’ Case
The Appellants’ Appraiser
Patrick Given, the appellants’ appraiser, appraised the value of the cottages using a “comparable sales” or market approach. He testified that this was the only acceptable approach when valuing single-family detached homes such as the subject cottages. Here, of approximately 100 actual cottage sales Given studied, some transactions that were undertaken with little consideration paid were not considered in his valuation because they were not arm’s-length transactions. In reaching his valua *84 tion, Given only considered 64 cottage sales over the course of the review period. Certain intrafamily transfers, an auction sale, and a distress sale were included in Given’s valuation because they did involve substantial consideration. Given used the sales in any particular year to come up with an appraised value for that year. He did not adjust for age, size, alterations, or location, but he did make downward adjustments for contents, such as furnishings sold with the cottage in varying percentages based on the identified contents that came with the cottage. Given determined a price per square foot for the cottages that had been sold during the review period.
Given relied on questionnaires filled out by the cottage owners, as well as the petitioner’s and the appellants’ records, for his sales data.[4] Given then explained how he determined a price per square foot for each of the cottages resulting in a value for the subject property for each year under review. Given arrived at an average appraised value for the cottages for each year under review.
Given also explained how he determined a rental value for the marina, utilizing comparable rental data from marinas in the Suffolk County area. Among his marina comparables, Given chose two on the North Fork of Long Island, one in Greenport and the other in Cutchogue, which he described as the “best” he could find. Given noted that it was common to value marinas under the income approach because they are income-generating businesses involving the rental of boat slips. He testified that the nominal fee paid by the petitioner’s residents for use of the subject marina was not indicative of any rent that one would encounter on the open market.
Based on his rental value appraisal of the marina, Given arrived at a value per linear foot of each boat slip for each year under review.
The Appellants’ Legal Expert
Barry Warren, an attorney specializing in the representation of condominiums, cooperatives, and homeowners’ associations, both in terms of the management and sponsors and builders of those entities, testified as a legal expert in this area on behalf of the appellants. Warren testified as follows in regard to the *85 distinguishing characteristics among condominiums, cooperatives, and homeowners’ associations:
“Beginning with a cooperative it is a — ordinarily a business corporation the way it’s presently formed that owns real property or leases real property, and the shareholders in that business corporation, by virtue of being shareholders, have the right to occupy the living arrangements within that cooperative. Ordinarily they’re referred to as apartments pursuant to proprietary leases with the corporation that owns the real property. The shares are issued to the stockholders in the corporation. The shareholders do not own any interest in real property as such. They contribute to the operation expenses of the corporation that owns the real property in the form of paying maintenance or rent ....
“And I might add right now it has nothing to do with the way the community looks. There’s nothing to do whether it’s an apartment or whether it’s a high-rise or whether or not it’s attached townhouses or detached homes. That has nothing to do with, with defining any of these three entities.
“A condominium is an interest in real property. In a condominium the unit owners, the owners of homes own fee simple title to their homes in addition to a percentage in the common areas of the condominium. Those common areas depend and vary from community to community. They could be the roadways, recreational facilities, grass, lawn areas, anything of that nature.
“If you add up all the percentages of common interest owned by the various unit owners in a condominium it should total 100 percent. The condominium owns nothing. Condominium owns no real property interest, owns no personal property interest.
“Taxes on the real property owned by the unit owners are paid directly by the unit owners. They get the same tax deduction that the owner of the traditional freestanding home in Nassau and Suffolk County would be entitled to. . . .
“In a homeowners association, which is more akin *86 to a condominium than a cooperative, again, there’s an interest in real property. Each unit owner or homeowner owns fee title to their home but instead of owning a percentage in a common area such as exists in a condominium or for that matter in a coop, such as recreational facilities or roadways or landscaped areas or the like, they do not have an ownership interest in those common areas per se. Instead, title to those common areas is vested in the homeowners association which is a not-for-profit corporation and by virtue of owning a home within a homeowners association that each homeowner automatically becomes a member in that homeowners association . . . and, therefore, has the opportunity to enjoy those facilities, drive over the roads, use the recreational facilities, use the clubhouse meeting rooms, whatever.”
According to Warren, documents that could demonstrate that a stock corporation was a residential cooperative included a Certifícate of Incorporation filed in the office of the New York Secretary of State reflecting the cooperative purpose, proprietary leases between shareholder tenants and the corporation, and corporate bylaws. Warren noted that the petitioner’s Certificate of Incorporation did not state that its corporate purpose was to be a residential cooperative. He also noted that the petitioner’s bylaws did not “reflect a cooperative for housing accommodations.” Further, according to Warren, the Cooperative Corporations Law required that a cooperative corporation include the word “cooperative” in its name or corporate title.
Warren’s opinion was that the petitioner functioned more like a homeowners’ association than a cooperative corporation or a condominium. In reaching the conclusion that the petitioner functioned more like a homeowners’ association than a cooperative, Warren emphasized that the cottages were owned by the shareholders, but the petitioner owned the land on which the cottages were situated; that the cottage owners were not shareholders of the petitioner; that the cottage owners did not participate in the operation of the petitioner, the entity which owned the real property; that the cottage owners could not deduct, for income tax purposes, the real estate taxes paid on the subject property; and that the cottage owners did not share in the obligation to maintain common areas. In concluding that the petitioner functioned more like a homeowners’ association than a condominium, Warren emphasized that the cottage own *87 ers did not have fee simple interest in any real property, but the property was owned by the petitioner instead; that the cottage owners did not have a share in ownership of common areas; that the cottage owners did not pay real estate taxes; and that the cottage owners were only permitted to sell to other members or potential members. Warren concluded that the petitioner operated in a manner most analogous to a homeowners’ association in that the members owned a cottage, and by virtue of that ownership, had the right to enjoy the facilities owned by the petitioner.
The Petitioner’s Rebuttal
The Petitioner’s Legal Expert
In rebuttal, the petitioner presented the testimony of its legal expert, Walter Goldsmith. Goldsmith concluded that the petitioner operated most like a cooperative. Goldsmith observed that “[tjhere is one piece of real estate, not any subdivision. There is a joint tax bill, one tax bill for the entire property.” The petitioner enjoyed the right to approve prospective cottage buyers for membership. Goldsmith also noted the prohibition against subleasing and the approval process for the transfer of any of the membership units.
Goldsmith disagreed with Warren’s conclusion that the petitioner operated most like a homeowners’ association, noting that, unlike the subject property, homeowners’ associations and condominiums involve the ownership of real property by each of the participants. Goldsmith also emphasized in this regard that, in connection with the subject property, the petitioner paid a single tax bill for the subject property, whereas, in a homeowners’ association, there would be a tax lot and separate tax bill for each individual unit.
The Decision after Trial
The trial court determined that the petitioner met its initial burden and rebutted the presumption of validity of the Town’s assessment by submitting Haberman’s appraisal, based on the appropriate and accepted methodologies of income capitalization and the cost approach. After weighing the relevant facts and circumstances, the trial court found that the manner in which the petitioner owned the subject property had more in common with a cooperative corporation than a homeowners’ association and that, therefore, Real Property Tax Law § 581 applied. The trial court adopted Haberman’s income approach and *88 discounted cash flow analysis instead of the comparable sales methodology. The trial court determined, in effect, that the petitioner proved by a preponderance of the evidence that the property was overvalued. Employing the methods utilized by Haberman, the trial court calculated and set forth the amount the petitioner was overassessed for each year under review.
Discussion
Presumptive Validity and Burden of Proof
“A property valuation by a tax assessor is presumptively valid” (Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d 652, 652 [2005]; see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d 179, 187 [1998]). “In challenging an assessment, a petitioner has a threshold burden of coming forward with ‘substantial evidence’ to rebut the presumption of validity” (Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d at 653, quoting Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d at 188). “The substantial evidence standard is a minimal standard that merely requires that [the] petitioner demonstrate the existence of a valid and credible dispute regarding valuation through the presentation of documentary and testimonial evidence that is based on sound theory and objective data” (Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d at 653 [internal quotation marks omitted]; see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d at 188; Matter of Commerce Holding Corp. v Board of Assessors of Town of Babylon, 88 NY2d 724, 732 [1996]). “During this threshold inquiry, the ultimate strength or credibility of the petitioner’s arguments is not at issue, nor is the weight to be given either party’s evidence” (Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d at 653; see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d at 188).
“Once a petitioner meets its burden of overcoming the presumption of validity, it is necessary for a court to weigh the entire record of evidence offered by both parties to determine whether the petitioner proved by a preponderance of the evidence that the property was overvalued” (Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d at 654). “In reaching its determination, the court should consider the relative merits of the appraisal methods used by the parties’ experts and make adjustments to the appraisals, where appropriate, to more accurately reflect the market value of the subject property” (id.).
*89 Appraisal Methodologies and Proper Classification
“In assessment review proceedings, the value at which real property may be taxed has been equated with market value” (W.T. Grant Co. v Srogi, 52 NY2d 496, 510 [1981], superseded in part by RPTL 720 [1] [b]). “The ‘market value of real property is the amount which one desiring but not compelled to purchase will pay under ordinary conditions to a seller who desires but is not compelled to sell’ ” (W.T. Grant Co. v Srogi, 52 NY2d at 510, quoting Heiman v Bishop, 272 NY 83, 86 [1936]; see generally Matter of JB Park Place Realty LLC v Assessor of Vil. of Bronxville, 13 Misc 3d 1233[A], 2006 NY Slip Op 52106[U] [2006], affd 50 AD3d 689 [2008]). “The determination of market value essentially is a question of fact. As such, the Appellate Division is empowered to make new findings of value where the trial court ‘has failed to give to conflicting evidence the relative weight which it should have’ ” (W.T. Grant Co. v Srogi, 52 NY2d at 510, quoting People ex rel. MacCracken v Miller, 291 NY 55, 61 [1943]).
With respect to appraisal methods, the Court of Appeals has stated:
“The command of section 306 of the Real Property Tax Law that all property be assessed at full value does not pronounce an inelastic approach to valuation. Nor does the legislative directive specify a particular method for establishing value. And courts, being under no compunction to do so, have not confined assessors to any one course. To ensure that the existence of varied and multifaceted patterns of land use and ownership does not frustrate the design that each contribute equitably to the public fisc, courts have upheld any fair and nondiscriminatory method that appears most likely to achieve that end” (Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau, 45 NY2d 538, 541 [1978]).
“The best evidence of value, of course, is a recent sale of the subject property between a seller under no compulsion to sell and a buyer under no compulsion to buy” (Matter of Allied Corp. v Town of Camillus, 80 NY2d 351, 356 [1992]). However, absent evidence of a recent, arm’s-length sale, the three approaches commonly employed to determine the value of real property are the comparable sales or market data approach; the income or income capitalization approach; and the cost or cost *90 less-depreciation approach (see Matter of Penthouse Mfg. Co. v Assessor of Vil. of Freeport, 102 AD2d 870 [1984]; see also Matter of Allied Corp. v Town of Camillus, 80 NY2d at 356).
“The income capitalization approach is generally regarded as the preferred method for determining the value of income-producing property” (41 Kew Gardens Rd. Assoc. v Tyburski, 70 NY2d 325, 331 [1987]; see Matter of John P. Burke Apts. v Swan, 137 AD2d 321, 325 [1988]; Matter of City of Albany [Johnson], 136 AD2d 818, 819 [1988]). It is the preferred method for valuing cooperative corporations (see Matter of River House-Bronxville v Gallaway, 100 AD2d 970, 972 [1984]).
“The income capitalization approach requires an appraiser to formulate a value estimate for the property by converting projected net income into a single present value. To do so, the market rent for the subject property must be estimated and then, from available market data, the appraiser must estimate a property allowance for vacancy and credit loss forecast to occur during the period of ownership. Further estimating and projecting anticipated fixed and operating expenses during the ownership, the appraiser is last left to select and apply an appropriate capitalization rate” (Matter of New Cobleskill Assoc. v Assessors of Town of Cobleskill, 280 AD2d 745, 746 n [2001]).
Put differently, “[v]aluation is obtained under this method by determining the rental value of the property; deducting from it the operating expenses; and, if there is a profit, capitalizing the net profit at a percentage commensurate with the amount of risk involved” (98 NY Jur 2d, Taxation and Assessment § 331; see The Appraisal of Real Estate at 445-467 [The Income Capitalization Approach], 499-517 [Direct Capitalization] [Appraisal Institute 13th ed]; Lee & LeForestier, Review and Reduction of Real Property Assessments in New York §§ 1.08, 8.04 [3d ed]).
The comparative sales approach, advocated by the appellants, involves the determination of the value of the subject property by “comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract” (Appraisal Institute, The Appraisal of Real Estate at 297 [The Sales Comparison Approach]). Additionally, adjustments are made to the sale prices of the comparables “based on relevant, market-derived elements of comparison” (id.). “A major premise *91 of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market’s reaction to comparable and competitive properties” (id.).
Here, the trial court accepted the petitioner’s income capitalization approach over the comparable sales approach proffered by the appellants, upon finding that the petitioner functioned more akin to a cooperative, within the meaning of RPTL 581 (4), than a homeowners’ association and, thus, should be valued pursuant to the income capitalization approach. The trial court’s finding that the manner in which the petitioner owned the subject property had more in common with a cooperative than with a homeowners’ association, and that the income capitalization approach was therefore the more appropriate valuation methodology, was based upon its acceptance of the testimony of the petitioner’s expert over that proffered by the appellants’ expert. Where conflicting expert testimony is presented, the trier of fact is entitled to accept one expert’s opinion and reject that of another, and the trier of fact’s resolution of the credibility of conflicting expert testimony is entitled to great weight (see Saccone v Gross, 84 AD3d 1208, 1209 [2011]; Ferreira v Wyckoff Hgts. Med. Ctr., 81 AD3d 587, 588 [2011]; Segal v City of New York, 66 AD3d 865, 867 [2009]).
We agree with the trial court’s acceptance of the petitioner’s expert’s opinion that the petitioner operates more like a cooperative corporation than a homeowners’ association. The subject property is on a single tax lot. There is only one tax bill charged to the owner of the property, and that bill is paid by the petitioner. Membership and, therefore, occupancy, is subject to an approval process. The members and occupants are subject to rules and regulations promulgated in the petitioner’s bylaws. Membership and, therefore, the right to occupancy, can be canceled by the petitioner for failure to abide by the bylaws. Cottage rentals and subleases are expressly prohibited. All cottage transfers require the petitioner’s approval, and are recorded in the unit’s corresponding file maintained by the petitioner.
Conversely, the petitioner is dissimilar to a homeowners’ association. Whereas properties subject to management by homeowners’ associations are divided into individual tax lots ascribed to each unit, the subject property is a single tax lot. While each cottage is assigned a designated plot by the petitioner, this is not done for tax purposes. Whereas homeowners’ associations *92 do not have the power to evict members for failing to abide by their rules, the petitioner does have this right, and has exercised it in the past. Sponsorship or member recommendation is not required in homeowners’ associations, whereas it is required by the petitioner to occupy a unit. Conveyances of properties subject to management by homeowners’ associations do not depend upon the approval of the homeowners’ association, whereas the petitioner here must approve of conveyances. A homeowners’ association typically does not impose occupancy restrictions such as the seasonal restriction imposed by the petitioner. Homeowners’ associations do not usually impose rental restrictions on units, whereas the petitioner prohibits such arrangements.
We also note that the Town’s tax bills designated the subject property as “non-homestead” as opposed to “homestead” pursuant to RPTL article 19, which subjects the property to a higher commercial tax rate. Homestead residential properties, such as single-family home subdivisions, are taxed at a lower rate (see RPTL 1901, 1903). Thus, the Town historically has treated the property as though it were commercial property, and not as though it were a residential single-family subdivision. Accordingly, the Town’s own classification does not support the appellants’ contention that the units should be valued individually as single-family homes.
Ultimately, we agree with the trial court’s conclusion that Haberman’s analysis of the petitioner’s similarities to a cooperative corporation, and dissimilarities to a homeowners’ association, was more convincing than Given’s analysis analogizing the petitioner to a homeowners’ association.
Real Property Tax Law § 581
Upon concluding that the petitioner owns and operates the subject property more like a cooperative corporation than a homeowners’ association, we turn to the question of whether the trial court properly applied Real Property Tax Law § 581 based, in part, on this conclusion.
Real Property Tax Law § 581 states, in part:
“Notwithstanding any other provision of law, real property owned or leased by a cooperative corporation or on a condominium basis shall be assessed for purposes of this chapter at a sum not exceeding the assessment which would be placed upon such parcel were the parcel not owned or leased by a coopera *93 tive corporation or on a condominium basis” (RPTL 581 [1] [a]).
“That statute has been correctly construed to mean that ‘condominiums and cooperatives [should] be assessed as if they were conventional apartment houses whose occupants were rent paying tenants’ ” (Matter of Greentree At Lynbrook Condominium No. 1 v Board of Assessors of Vil. of Lynbrook, 81 NY2d 1036, 1039 [1993], quoting Matter of South Bay Dev. Corp. v Board of Assessors of County of Nassau, 108 AD2d 493, 500 [1985]). “The purpose of RPTL 581 was to insure that owners of condominium and cooperative properties would be taxed fairly compared to rental properties held in single ownership and not penalized because of the type of ownership involved in their multiple dwellings” (Matter of D. S. Alamo Assoc. v Commissioner of Fin. of City of N.Y., 71 NY2d 340, 347 [1988], citing Matter of Marks v Pelcher, 58 AD2d 812 [1977], affd 49 NY2d 954 [1980]). Under RPTL 581 (1) (b), however, the provisions of paragraph (a) of subdivision (1) shall not apply to real property classified within the “homestead” class of an approved assessing unit.
As to what qualifies under the pertinent sections of the Real Property Tax Law as a cooperative corporation, Real Property Tax Law § 581 (4) states,
“For the purposes of this section, the term ‘cooperative corporation’ shall include any corporation organized under any special or general law of this state, including, but not limited to, the business corporation law, the cooperative corporations law, the not-for-profit corporation law, and the private housing finance law, or the predecessor statutes thereof, primarily for providing housing accommodations to its stockholders or members and which is, or is to be, operated for the benefit of the persons or families who are entitled to occupancy by reason of ownership of stock or membership in the corporation.”
We conclude that the petitioner’s manner of owning the subject property falls within the definition of “cooperative corporation” within the meaning of RPTL 581 (4).
The Corporation
The petitioner, which owns the subject property, and the Club, in which membership is a condition precedent to occupancy of a cottage, are intertwined entities that should be *94 treated as one for purposes of this proceeding. This conclusion is consistent with a finding made in a prior appeal in this matter, in which the issue of standing was raised (see Matter of W.O.R.C. Realty Corp. v Board of Assessors, 283 AD2d 509, 509-510 [2001] [“The Supreme Court properly denied that branch of the appellants’ motion which was to dismiss the petition. Contrary to the appellants’ contention, the petitioner is an aggrieved party entitled to bring this proceeding to review a tax assessment of the real property at issue for the tax year 1993-1994, as its pecuniary interests are or may be adversely affected by an illegal assessment” (internal quotation marks omitted)]).
The petitioner was organized in 1950 as a not-for-profit corporation under article 2 of the former Stock Corporation Law, predecessor to the Business Corporation Law, thereby satisfying the requirement of RPTL 581 (4) that the subject corporation must have been “organized under any special or general law of this state, including, but not limited to, the business corporation law, the cooperative corporations law, the not-for-profit corporation law, and the private housing finance law, or the predecessor statutes thereof.”
Functional Equivalent of Stock
While the residents are not issued stock in either the petitioner or the Club, and they do not enter into proprietary leases, they are issued the functional equivalent of stock in the form of membership certificates from the corporation. Additionally, while the individual residents own their own cottages, occupancy is predicated upon membership in the Club. According to the bylaws, no one can occupy a cottage on the property without the consent, approval, and control of the petitioner and the Club.
Providing Housing Accommodations
While the bylaws do not expressly state that the purpose of the corporation is to provide housing accommodations, they do state that the purpose of the Club is to provide facilities for the recreation and enjoyment of its members and their families during the summer months and to promote social activities during the winter months. We conclude that this is sufficient to satisfy the requirement of RPTL 581 (4) that the corporation, here the petitioner, through the Club, is organized “primarily for providing housing accommodations to its stockholders or members.”
*95 Providing Facilities for Enjoyment of Members
As for the final requirement set forth in the statute, there is sufficient evidence in the record to support the conclusion that the corporation “is, or is to be, operated for the benefit of the persons or families who are entitled to occupancy by reason of ownership of stock or membership in the corporation” (RPTL 581 [4]). In short, the Club was organized to provide the facilities for the enjoyment of its members, who are only entitled to occupancy of their cottages and use of the subject property by reason of their membership in the Club, which must be approved by the petitioner.
Thus, for the reasons expressed above, we agree with the trial court’s determination regarding the applicability of RPTL 581 to these proceedings, as well as its adoption of the petitioner’s income capitalization approach.
The Appellants’ Challenges to the Petitioner’s Comparables
The appellants argue that the petitioner’s income and expense comparables were too remote from the subject property. Comparables utilized in a tax certiorari proceeding for appraisal purposes which are too “remote” from the subject property, and require “extensive adjustment,” are, as a result, diminished in their evidentiary value (see e.g. Matter of Bialystock & Bloom v Gleason, 290 AD2d 607, 610 [2002]). However, it has also been held that, while “comparable sales should not be too remote in location from the subject property” in a tax certiorari proceeding, accepting evidence of sales of property “beyond the immediate vicinity of the subject property is a matter resting in the sound discretion of the trial judge” (Welch Foods v Town of Westfield, 222 AD2d 1053, 1054 [1995] [internal quotation marks omitted]).
In support of their argument, the appellants note that, of the nonseasonal or winter income comparables considered by the petitioner’s appraiser, the significant majority of them were approximately 20 to 30 miles away. The appellants also note that those comparables were not only too remote, but were also in “inferior” areas in different towns, and that only one had access to the Great South Bay. The appellants further note that the petitioner’s expense comparables were remote in that they were apartment houses in Nassau County. Relying on Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack (92 NY2d at 189), the appellants assert that these remote comparables may only be used if the evidence indicates that a broad regional market exists outside the local market for the subject property, which was not demonstrated here.
*96 However, again, where conflicting expert testimony is presented, the trier of fact is entitled to accept one expert’s opinion and reject that of another (see Saccone v Gross, 84 AD3d at 1209; Ferreira v Wyckoff Hgts. Med. Ctr., 81 AD3d at 588; Segal v City of New York, 66 AD3d at 867). The trial court’s determination in resolving issues of credibility created by expert appraisers’ conflicting opinions is entitled to deference on appeal (see Matter of Ace Hardware Corp. v Little, 63 AD3d 1345, 1348 [2009]).
Here, the evidence demonstrated that the petitioner’s appraiser searched the neighborhood in which the subject property was situated and surrounding communities for comparable market data. Rentals were selected for direct comparison to the subject property, with adjustments applied for time, location, size, condition, and amenities. The rental comparables were located in residential or mixed-use, non-gated neighborhoods. They were free standing, all-season, single-family dwellings, with building areas of between 400 to 1,000 square feet, and three to six rooms. In addition, the petitioner’s appraiser selected rental comparables all situated in Suffolk County, either in close proximity to the Great South Bay, as is the subject property, or with similar access to recreational and beachfront areas. Furthermore, the petitioner’s appraiser utilized both rental comparables that were in close proximity to beach areas, and rental comparables that were water view and waterfront, as is the case with the units on the subject property. Thus, as the petitioner persuasively argues, contrary to the appellants’ contention, these rental comparables were neither grossly remote in distance nor dissimilar to the subject property.
The appellants rely on Matter of Manno v Finance Adm’r of City of N.Y. (92 AD2d 896 [1983]) in support of their contention that, taking into account the total adjustments made by the petitioner’s appraiser to the comparable leases, the degree of dissimilarity should have led the trial court to disregard them. However, Manno makes no reference to any specific mathematical computation or requirement as to how adjustments must be considered. In addition, the “markedly dissimilar” property in that case was a “one-story industrial building, with unpainted concrete block walls and floors, no central heating or air conditioning and only two washrooms” (id. at 896). “By way of contrast, the petitioner’s building [was] a two-story commercial building operated as a catering establishment, [was] located in a different geographical area, has finished walls and floors, a *97 finished basement, 10 washrooms, a kitchen, an elevator and central heating and air conditioning” (id.). “Moreover, the petitioner’s appraiser admitted that his ‘comparable’ was an inferior building, and adjusted its rental value upward by approximately 50% in arriving at his estimate of value for the petitioner’s building” (id.). Thus, this Court held that the testimony of the petitioner’s appraiser, based solely upon his analysis of this one “markedly dissimilar” building, did not support his conclusions on value, and was not sufficient to satisfy the petitioner’s burden of proof (id.).
Here, the selected comparables do not approach such a degree of dissimilarity.
22 NYCRR 202.59 (g) (2)
22 NYCRR 202.59 (g) (2) provides that
“appraisal reports shall contain a statement of the method of appraisal relied on and the conclusions as to value reached by the expert, together with the facts, figures and calculations by which the conclusions were reached. If sales, leases or other transactions involving comparable properties are to be relied on, they shall be set forth with sufficient particularity as to permit the transaction to be readily identified, and the report shall contain a clear and concise statement of every fact that a party will seek to prove in relation to those comparable properties. The appraisal reports also may contain photographs of the property under review and of any comparable property that specifically is relied upon by the appraiser, unless the court otherwise directs.”
According to the appellants, the petitioner’s appraisal is not in compliance with 22 NYCRR 202.59 (g) (2), as it is based on unverified information gleaned from third parties, and not verified facts. The appellants emphasize that the comparables in the appraisal were merely printouts from the Multiple Listing Service. The appellants claim that the petitioner’s appraiser did not personally collect the data, inspect the comparables, or verify any of the data, and the persons who performed the inspections were not available for cross-examination at trial. The appellants further assert that the petitioner’s appraiser made only a cursory inspection of the subject property.
The appellants’ assertions are without merit. First, it was established at trial that all the information gathered was veri *98 fied, either by a tenant, owner, or broker of record. Second, it was established that it was standard custom and usage in the practice of appraising to utilize subordinate assistance for appraisal assignments and, therefore, it is of no relevance that Haberman’s staff, under his supervision, conducted field work and research in order to retrieve information that helped in the creation of a database of comparable properties. Indeed, there is no requirement that Haberman visit the comparables. Further, the evidence established that Haberman visited the subject property several times, and personally inspected a number of the units. Accordingly, the appellants’ claim in connection with 22 NYCRR 202.59 (g) (2) is without merit.
The Marina
According to the appellants, the trial court erred in accepting the petitioner’s appraisal of the marina because it valued the actual income of the marina at $35 per slip per season. The appellants claim that the marina’s value should have been based on the market rates for boat slips in Suffolk County, which, it asserts, are significantly higher.
If examination reveals that rent has been arbitrarily set without regard to market rental value, “the rent arrangement will be of little, if any, guidance to sound appraisal” (Matter of Merrick Holding Corp. v Board of Assessors of County of Nassau, 45 NY2d at 543). “On the other hand, in arriving at their valuations, assessors may always consider below market rents that result from arm’s length bargaining carried out in good faith” {id.).
The marina is owner-operated and, at first glance, it would seem to be of little value for the petitioner’s appraiser to use the actual rent in his appraisal of the marina. However, the trial court properly rejected the approach advocated by the appellants. The comparables on which the appellants relied were full-service marinas equipped with electricity, repair services, and fueling stations. The subject marina has virtually no amenities, and merely consists of boat slips. Given failed to make any adjustments to his comparables to account for the marina’s lack of amenities. Finally, the appellants’ appraiser established a 25% expense ratio for the marina, using actual operating income expenses of several unidentifiable and unverifiable expense com-parables. Since Given failed to identify his marina expense com-parables, and failed to include other expenses such as management and security, his appraisal of the marina failed to satisfy 22 NYCRR 202.59 (g) (2).
*99 The Petitioner Met Its Burden
Based on the foregoing, we conclude that the trial court properly determined that the petitioner satisfied its initial burden of rebutting, with substantial evidence, the presumption of validity of the Town’s assessment (see generally Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d at 188; Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d at 653). Haberman’s expert testimony, which the trial court accepted, was sufficient to rebut the presumption of validity.
Moreover, based on the relative merits of the appraisal methods utilized by the parties’ experts, and making adjustments where appropriate, the trial court properly determined, in effect, based on the entire record, that the petitioner proved, by a preponderance of the evidence, that the subject property was overassessed (see generally Matter of Century Realty, Inc. v Commissioner of Fin., 15 AD3d at 654).
The Parties’ Remaining Contentions
The parties’ remaining contentions either are without merit or need not be reached in light of our determination.
Conclusion
The trial court correctly determined that the petitioner overcame the presumption of assessment validity, and that, based on the entire record, the petitioner proved by a preponderance of the evidence that the subject property was overassessed.
Accordingly, the judgment is affirmed.
Dillon, J.E, Chambers and Miller, JJ., concur.
Ordered that the judgment is affirmed, with costs.

. Haberman’s capitalization rate was market-derived. He also looked at actual cottage sales, although, unlike the appellants, he did not rely upon them for valuation purposes.

. Haberman made adjustments for cottages with or without water views or water frontage. Water-view cottages were upwardly adjusted by 10%, and the waterfront cottage was upwardly adjusted by 20%. Adjustments were also made for the fact that the rental market fluctuated during the years at issue. For instance, market data revealed that rentals were going down 5% from 1992 to 1993, but rebounded in later years during the period under review. He made upward adjustments as high as 30% to his comparables to account for the subject property’s amenities such as beach rights, protected swim areas, boat slips, gated access, and extended seasonal usage. He also made adjustments to account for the fact that some of the comparables were located in areas considered “inferior” to the subject property’s Oakdale location, based upon the general rule that inferior comparables have to be incremented. He also made a number of downward adjustments for circumstances such as “time trending].”

. Haberman has appraised dozens of marinas on the North and South Shores of Long Island, and normally uses an income analysis, applying, inter alia, a rental value to the linear footage of the slips. He considered the depth of the marina here a detriment due to the need for routine dredging. He also admitted that he failed to account for an increase to 153 slips over the years through rearranging the docks. In order to prepare his appraisal, Haberman did not inquire of any boat slip rentals in the Oakdale area or anywhere else in the Town of Islip or Suffolk County. He did not research marina rates. According to Haberman, the marina was operating at a loss during some of the years under review.

. Given testified that, when determining cottage sizes, he utilized the cottage files held by the petitioner, and the Town Assessor’s property cards for each cottage, and used the latter where there was a discrepancy, since the cards reflected an actual measurement that had been done in the field by the Town.