■ In the Matter of ULSTER BUSINESS COMPLEX, LLC, Appellant, v TOWN OF ULSTER et al., Respondents. (Proceeding No. 1.) In the Matter of AG PROPERTIES OF KINGSTON, LLC, Appellant, v TOWN OF ULSTER et al., Respondents. (Proceeding No. 2.) [740 NYS2d 718] —Crew III, J. Appeal from a judgment of the Supreme Court (Kavanagh, J.), entered November 27, 2000 in Ulster County, which dismissed petitioners' applications, in two proceedings pursuant to RPTL article 7, to reduce a tax assessment on certain property owned by petitioners.

These two proceedings pursuant to RPTL article 7 seek to challenge the tax assessment imposed upon approximately 250 acres of real property formerly occupied by IBM Corporation and located in the Town of Ulster, Ulster County. In early 1994, IBM elected to vacate the facility and placed the property on the real estate market. Following a failed attempt by the State to purchase a portion of the property in 1996, the property was subdivided into 27 separate tax parcels,[1] 23 of which contain buildings comprising roughly 2.5 million square feet of gross building area. Eight of these buildings are office buildings, 13 are industrial buildings, one houses the sewage treatment plant for the site and the remaining one houses the utility plant. Of the remaining four parcels, two consist of vacant lots, one contains the parking lot and the final parcel, Boices Lane Extension, is a private road that was dedicated to respondent Town of Ulster (hereinafter respondent). Each

---

1. The 27 parcels are zoned "OM" or "Office-Manufacturing."

parcel has an easement for ingress and egress to the entire site, as well as use of the interior roadways and parking areas and access to utility services.

In 1997, the State entered into an agreement with Fleet National Bank by which Fleet would process state income tax returns. In conjunction therewith, Fleet entered into a lease with Enterprise Business Complex Corporation, an entity of IBM, pursuant to the terms of which Fleet would occupy three buildings (all located on a single parcel) at the former IBM site. IBM or its designee, in turn, would receive approximately $3.7 million, amortized over seven years at $8^{1/2}\%$ interest.

Thereafter, in February 1998, petitioner Ulster Business Complex, LLC (hereinafter UBC) purchased 3 of the 27 parcels at issue, and petitioner AG Properties of Kingston, LLC (hereinafter AG Properties) purchased the remaining 24 parcels. At the closing, IBM also executed a 10-year lease for approximately 200,000 square feet of space on two parcels and agreed to pay substantial rent during the course of the lease term. The contract of sale between UBC and IBM also provided that IBM would recover the approximately $13.5 million previously expended on improvements to the Fleet buildings, with such sum amortized over seven years at $8^{1/2}\%$ interest.

As for the terms of the sale, UBC paid $100,000 for the three parcels it purchased and AG Properties paid $3 million for the 24 parcels it purchased. At the closing, GMAC Commercial Mortgage Corporation loaned UBC a total of $20,805,000, with said sum secured by two mortgages on those parcels housing the buildings leased to IBM and Fleet. Alan Ginsberg, the principal shareholder of both UBC and AG Properties, used $3.1 million to purchase the entire property, $11,622,396 to purchase the outstanding loan for improvements to the Fleet buildings, thereby entitling Ginsberg to receive payments on such loan, and $676,275 to pay the closing costs. Ginsberg and UBC retained the remaining proceeds, and all rents generated by the Fleet and IBM leases were assigned to GMAC.

Respondent thereafter assessed each of the 27 parcels individually and arrived at a combined value of $71 million as of March 1, 1998—the tax status date. Respondent's Board of Assessment denied petitioners' subsequent grievances, prompting petitioners to commence these RPTL article 7 proceedings to challenge the underlying assessment. Following a nonjury trial, at which the parties submitted their respective appraisals, Supreme Court found that petitioners had failed to

overcome the presumption of validity attached to the assessment and dismissed the petitions. This appeal ensued.[2]

It is well settled that "a property valuation by the tax assessor is presumptively valid" (*Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, 92 NY2d 179, 187). If, however, the petitioning taxpayer comes forward with "substantial evidence" to the contrary, the presumption of validity disappears (*see, id.* at 187). In this regard, the relevant case law makes clear that the "substantial evidence" standard requires the petitioner to demonstrate nothing more than the existence of "a valid and credible dispute" as to the underlying valuation (*see, id.* at 188; *see also, Matter of New Cobleskill Assoc. v Assessors of Town of Cobleskill*, 280 AD2d 745, 747, *lv denied* 96 NY2d 715). Thus, in resolving this threshold inquiry, a court's function is not to assess the merits of the petitioner's arguments or to weigh the evidentiary value of the parties' respective submissions but, rather, to "simply determine whether the documentary and testimonial evidence proffered by [the] petitioner is based on 'sound theory and objective data' * * * rather than on mere wishful thinking" (*Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, *supra* at 188, quoting *Matter of Commerce Holding Corp. v Board of Assessors of Town of Babylon*, 88 NY2d 724, 732). Such "objective data" may include evidence of a recent sale of the subject property (*see, Matter of Allied Corp. v Town of Camillus*, 80 NY2d 351, 356) or a "detailed, competent appraisal based on standard, accepted appraisal techniques and prepared by a qualified appraiser" (*Matter of Niagara Mohawk Power Corp. v Assessor of Town of Geddes*, 92 NY2d 192, 196).

Applying these principles to the matters before us, it is readily apparent that the proof offered by petitioners, including evidence of the recent sale of the property, the testimony of their appraiser, Eugene Albert, and Albert's appraisal report, constitutes substantial evidence of a valid and credible dispute as to the valuation of the parcels in question. Whatever deficiencies may exist in Albert's appraisal report or his underlying methodology go to the weight to be accorded his testimony and/or report and are not relevant considerations at this juncture. Thus, to the extent that Supreme Court determined that petitioners had failed to overcome the presumption of validity, its findings in this regard were erroneous.

Having concluded that petitioners indeed put forth substantial evidence to rebut the presumption of validity attached to

---

2. Respondent Kingston City School District did not submit a brief on appeal.

the underlying tax assessment, it remains the function of this Court to "weigh the entire record, including evidence of claimed deficiencies in the assessment, to determine whether petitioner[s] [have] established by a preponderance of the evidence that [their] property has been overvalued" (*Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack*, 92 NY2d 179, 188, *supra*; *see*, *Matter of Wolf Lake v Board of Assessors for Town of Thompson*, 271 AD2d 925). As petitioners are quick to point out, a recent arm's length sale of the property in issue, if not explained away as abnormal, certainly is the best evidence of value (*see*, *W.T. Grant Co. v Srogi*, 52 NY2d 496, 511).

Here, however, the record as a whole raises serious questions as to whether the $3.1 million sale price reflects the true fair market value of the property. As a starting point, petitioners' own appraiser valued the property at $7.5 million as of the May 1, 1998 appraisal date—almost 2½ times the purchase price. Additionally, the Fleet and IBM leases, together with the guaranty agreement executed by IBM, enabled petitioners to mortgage the relevant parcels for approximately $20 million, of which only $3.1 million was used to purchase the property. Even after deducting the amounts necessary to buy out the outstanding loan for improvements made to the Fleet buildings and pay the closing costs, Ginsberg and UBC were left with in excess of $5 million. In short, the fact that petitioners were able to secure two mortgages for almost seven times the amount actually paid for the property casts serious doubt on the reliability of the $3.1 million sale price as a measure of market value.

Having discounted the evidence of the sale price for the property, we are left with the competing appraisals submitted by Albert and respondent's appraiser, Michael Bernholz. Although both Albert and Bernholz utilized the comparable sales and income approach to value the subject property, Albert valued the site as a single unified property under single ownership, whereas Bernholz appraised each of the 27 parcels individually. As the Court of Appeals has observed: "The determination of whether to value an integrated multibuilding industrial property as a single entity or as an aggregate of several subdivided entities is essentially a factual determination of the most economically and physically feasible use of the complex, and whether the taxing authority should assess such properties on the basis of a subdivision theory depends upon the circumstances of the particular case and the evidence offered in support of the proposition that the particular facility could be subdivided and sold in parts" (*Matter of General Elec. Co. v*

*Town of Salina,* 69 NY2d 730, 732; *see, Matter of P.G.C. Assoc. v Assessors of Town of Riverhead,* 270 AD2d 272, 273, *lv dismissed* 95 NY2d 825).

Although petitioners argue that the property at issue must be appraised as a single integrated entity, we are not so persuaded. Not only was the subject property granted subdivision approval two years prior to the tax status date, but the property ultimately was sold to two distinct legal entities—UBC and AG Properties. Although Ginsberg indeed is the principal shareholder in each limited liability corporation, that does not alter the fact that portions of the property were sold to two separate entities via two separate deeds. Additionally, the respective IBM and Fleet leases illustrate the economic and physical feasibility of the separate use and operation of the various parcels. Thus, taking into consideration the particular characteristics of the property at issue and the manner in which the underlying purchase was financed, together with the manner in which the property was utilized during the relevant time period, we find Bernholz's appraisal methodology, whereby each of the 27 parcels was appraised individually, to be more persuasive.

In addition to a general introductory report, Bernholz submitted detailed self-contained appraisal reports on each of the 27 parcels at issue except the two parcels containing the utility plant (parcel No. 48.7-1-29.600) and the road (parcel No. 48.7-1-29.280). With regard to the latter two parcels, Bernholz reasoned that both the utility plant and the road contributed to the value of the remaining parcels and buildings and, therefore, valuing such parcels separately would amount to "double dipping." Bernholz employed similar reasoning with regard to the parcels containing the parking lot (parcel No. 48.7-1-29.270) and the sewage treatment plant (parcel No. 48.7-1-29.300) and, accordingly, valued only the excess land existing on each of those parcels. As the appraised values assigned to these four parcels by Bernholz are lower than those fixed by respondent's assessor, such assessments should be reduced accordingly.[3]

We reach a similar conclusion regarding six additional parcels—namely, parcel Nos. 48.7-1-29.110, 48.7-1-29.120, 48.7-1-29.150, 48.7-1-29.190, 48.7-1-29.200 and 48.7-1-29.500.

---

**3.** To the extent that respondent may not have factored in the added value of these four parcels in determining the individual assessments for the remaining 23 parcels, its remedy is to assess the latter to reflect the value added by the former (*see, Matter of Wolf Lake v Board of Assessors for Town of Thompson,* 271 AD2d 925, 926, *supra*).

Based upon the appraisal reports submitted by Bernholz, each of the aforementioned parcels is overvalued and the corresponding assessments should be reduced accordingly.[4] As to the remaining 17 parcels, we find that the record as a whole fails to demonstrate, by a preponderance of the evidence, that such parcels indeed were overvalued. Therefore, respondent's assessments with regard to such parcels will not be disturbed.

Mercure, J.P., Mugglin, Rose and Lahtinen, JJ., concur. Ordered that the judgment is modified, on the law, without costs, by reversing so much thereof as dismissed the petition in proceeding No. 2 in its entirety; said petition granted to the extent that the assessments as to the parcels identified in footnote four of this Court's decision are annulled; and, as so modified, affirmed.

---

4. To summarize, the following parcels, all of which were owned by AG Properties, were overvalued by the amounts indicated.

| Parcel No. | Assessed Value | Appraised Value Per Bernholz | Overvaluation |
| --- | --- | --- | --- |
| 48.7-1-29.110 | $ 4,350,000 | $ 3,665,000 | $ 685,000 |
| 48.7-1-29.120 | 1,150,000 | 715,000 | 435,000 |
| 48.7-1-29.150 | 4,450,000 | 3,665,000 | 785,000 |
| 48.7-1-29.190 | 1,070,000 | 725,000 | 345,000 |
| 48.7-1-29.200 | 570,000 | 560,000 | 10,000 |
| 48.7-1-29.270 | 1,800,000 | 500,000 | 1,300,000 |
| 48.7-1-29.280 | 75,000 | 0 | 75,000 |
| 48.7-1-29.300 | 1,600,000 | 500,000 | 1,100,000 |
| 48.7-1-29.500 | 14,080,000 | 13,325,000 | 755,000 |
| 48.7-1-29.600 | 4,000,000 | 0 | 4,000,000 |