## State of New York
## Supreme Court, Appellate Division
## Third Judicial Department

Decided and Entered: April 14, 2016                    521281
_____

In the Matter of AG PROPERTIES
    OF KINGSTON, LLC,
                    Appellant,

        v

TOWN OF ULSTER ASSESSOR et al.,
                    Respondents.

(And Another Related Proceeding.)

(Proceeding No. 1.)
_____

In the Matter of ULSTER
    BUSINESS COMPLEX, LLC,
                    Appellant,

        v                              MEMORANDUM AND ORDER

TOWN OF ULSTER ASSESSOR et al.,
                    Respondents.

(And Another Related Proceeding.)

(Proceeding No. 2.)
_____

In the Matter of TECHCITY 52,
    LLC,
                    Appellant,

        v

TOWN OF ULSTER ASSESSOR et al.,
                    Respondents.

(And Another Related Proceeding.)

(Proceeding No. 3.)

_____

In the Matter of TECHCITY 22,
   23 & 24, LLC,
                    Appellant,

      v

TOWN OF ULSTER ASSESSOR et al.,
                    Respondents.

(And Another Related Proceeding.)

(Proceeding No. 4.)
_____

In the Matter of AG PROPERTY
   OF KINGSTON LLC et al.,
                    Appellants,

      v

BOARD OF ASSESSMENT REVIEW OF
   THE TOWN OF ULSTER et al.,
                    Respondents.

(Proceeding No. 5.)
_____


Calendar Date:  January 7, 2016

Before:  Peters, P.J., Garry, Rose and Lynch, JJ.


                    _____


      Goldman Attorneys PLLC, Albany (Paul J. Goldman of
counsel), and Jacobowitz & Gubits, LLP, Walden (John Thomas of
counsel), for appellants.

      Tabner, Ryan and Keniry, LLP, Albany (Brian M. Quinn of
counsel), for Town of Ulster Assessor and others, respondents.

Shaw, Perelson, May & Lambert, LLP, Valhalla (Marc Sharff of counsel), for Kingston City School District, respondent.

_____

Lynch, J.

Appeal from an order of the Supreme Court (Melkonian, J.), entered September 3, 2014 in Ulster County, which dismissed petitioners' applications, in nine proceedings pursuant to RPTL article 7, to reduce the 2010, 2011 and 2012 tax assessments on certain real property.

Petitioners commenced these proceedings pursuant to RPTL article 7 challenging the 2010, 2011 and 2012 tax assessments imposed upon property called Techcity East, which is the eastern portion of an office and industrial complex formerly occupied by IBM corporation, located in the Town of Ulster, Ulster County. In 1998, petitioners purchased the property, which consists of 24 parcels including 21 buildings.[1]  Following a bench trial, Supreme Court determined that petitioners' appraisal was deficient as a matter of law and dismissed the petitions. Petitioners appeal.

Petitioners maintain that Supreme Court erred in finding that they failed to satisfy their threshold burden of establishing a prima facie dispute as to valuation through a competent appraisal.  We agree.  In a prior proceeding involving the parties and a challenge to the 1998 assessment that included this property, we reviewed the governing standard as follows: "It is well settled that a property valuation by the tax assessor is presumptively valid.  If, however, the petitioning taxpayer comes forward with substantial evidence to the contrary, the presumption of validity disappears. . . . [T]he substantial evidence standard requires the petitioner to demonstrate nothing

_____

[1]  The tax parcels — which include real property and building(s) thereon — will be identified by reference to the building numbers.

more than the existence of a valid and credible dispute as to the underlying valuation. Thus, in resolving this threshold inquiry, a court's function is not to assess the merits of the petitioner's arguments or to weigh the evidentiary value of the parties' respective submissions but, rather, to simply determine whether the documentary and testimonial evidence proffered by [the] petitioner is based on sound theory and objective data . . . rather than on mere wishful thinking. Such objective data may include . . . a detailed, competent appraisal based on standard, accepted appraisal techniques and prepared by a qualified appraiser" (Matter of Ulster Bus. Complex v Town of Ulster, 293 AD2d 936, 938 [2002] [internal quotation marks and citations omitted]; see Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d 179, 188 [1998]). Applying these principles, we conclude that the proof offered by petitioners, including the testimony and 13-volume report of their appraiser, John Coyle, constituted substantial evidence of a viable valuation dispute between the parties.

The combined assessed value of the property totaled approximately $32 million, or the equivalent of $43.9 million in fair market value. In his appraisal, Coyle valued the complex two ways: as a single entity with a market value of $14,850,000, and as 21 separately assessed parcels, each essentially including one building, with a total market value of $21,853,000. In our previous ruling, we concluded that the more persuasive method was to value the complex as separate parcels (Matter of Ulster Bus. Complex v Town of Ulster, 293 AD2d at 939-940). While the present dispute is confined to 21 parcels situate in the eastern portion of the former IBM complex, the parcels remain separately assessed, and we agree with Supreme Court that valuing the property as a single entity is misguided (compare Matter of General Elec. Co. v Town of Salina, 69 NY2d 730, 731-732 [1986]). This is particularly so, as Supreme Court noted, since petitioners have removed the central heating plant and have demolished certain buildings to enhance the independent use of the remaining buildings.[2] For his part, Coyle explained that he performed both valuations to determine whether the property would

---

[2] Buildings 5S and 31 have been demolished.

be worth more as a whole or as independent parcels.  As petitioners' counsel confirmed during oral argument, they are asserting that the separate parcel valuation governs.

We part ways with Supreme Court, however, with respect to the court's rejection of Coyle's separate property valuations. Coyle separated the parcels into three distinct groups: those in the rear of the campus (i.e., 29, 52, 64, 42, 43, 33 and 51), which are in good condition and occupied; those with potential office use (i.e., 21, 22, 23, 24 and 25); and those located in what Coyle refers to as the "central core" and formerly used for manufacturing (i.e., 5S, 5N, 2, 3, 4, 1, 34, 35, 31 and 32). With respect to this third category, Coyle determined that to maximize value, it was necessary to demolish several of the interconnected buildings (buildings 2, 4, 34 and 35) to create independent structures that would be more marketable.  After valuing the parcels in the second and third categories, Coyle utilized a downward adjustment factoring in the cost to rehabilitate each structure.  Where the net value of a rehabilitated building was projected to be less than the cost of renovation, Coyle assigned a value to the underlying land only.

The taxable status of real property is determined according to its condition as of July 1 preceding the tax year in question (see RPTL §§ 301, 302 [1]).  Given the nature of this complex, petitioners' thesis is that the "as is" condition of the property must be measured by its fair market value, less the costs necessary to restore each building for suitable occupancy (see Matter of Commerce Holding Corp. v Board of Assessors of Town of Babylon, 88 NY2d 724, 730-732 [1996]).  Under this "cost to cure" analysis, it is necessary to both identify the scope of work needed and the corresponding cost.  To that end, Coyle utilized a cost estimate prepared by David Trommelen.  After approving Trommelen as an expert witness in the field of cost estimation, Supreme Court ultimately rejected his testimony as unreliable, finding that he admitted preparing the scope of work at Coyle's directive and that Coyle "had no expertise in building."  The court further concluded that neither Trommelen nor Coyle were qualified to estimate the cost of electrical work, and that Trommelen failed to verify local costs in utilizing cost data from RSMeans, a national construction trades publication.

In our view, Supreme Court's critiques are not borne out by the record. Trommelen conceded on cross-examination that Coyle directed him as to the scope of the work, but he did so based upon their inspections and meetings to identify the work necessary to prepare the facilities for occupancy. As explained by Coyle, Trommelen was tasked to inventory the buildings and identify the scope and cost of the work. For his part, Trommelen testified that he had 30 years of experience and was the owner of a "construction management firm specializing in cost estimation." Trommelen explained that RSMeans has a local multiplier that he utilized for this Ulster County area. Trommelen further testified that he verified the local costs for demolition, roofing and electrical work through his work on the Global Foundries project in Saratoga County. He prepared both a "scope of work" report for each building and a separate report estimating the specific costs of renovation or demolition for each structure. Insofar as he prepared electrical cost estimates, each estimate includes a specific reference to the RSMeans data. In our view, petitioners provided viable expert proof as to the scope of work required for each building, and a cost estimate for that work.

Coyle valued each separate parcel utilizing either the comparable sales and/or the capitalization of income method. Coyle explained that he was unable to identify comparable sales to perform a market valuation for parcels 2, 4, 5S, 22, 23, 24, 34, 35 and 5N given the integrated nature of the complex. He did, however, perform an income valuation for these parcels, assuming completion of the renovation work needed to make each parcel suitable for occupancy. For this analysis, he utilized a market study, as well as comparable office and industrial leases, to project potential income, while reducing the value by the cost to cure. For several parcels situate within the "central core" (2, 4, 5S, 5N, 34 and 35), Coyle concluded that each parcel would have a negative value if the buildings thereon are renovated. Consequently, he assigned a value to the land for each parcel.

A further key identifying feature of this complex is that IBM remains bound under a consent order with the state to continue efforts to remediate environmental contamination at the site. With a property, as here, involving a large integrated

multibuilding former industrial complex, coupled with ongoing environmental remediation efforts, a "flexible approach" is warranted in developing the method to value the property (Matter of Commerce Holding Corp. v Board of Assessors of Town of Babylon, 88 NY2d at 731). Although IBM remains bound to pay for the actual remediation costs, considerable remediation has been completed over the years and several buildings are occupied, the remediation is ongoing and will continue for the foreseeable future. Contrary to the finding of Supreme Court, we conclude that a reasoned basis exists for Coyle to have factored in the environmental status of the property in determing market value (id. at 732). In doing so, he coupled the environmental status of the property with the results of the market study to project a vacancy rate of 15%, which was utilized in measuring the market value of each parcel, with some exceptions. By comparison, respondents' appraiser, Jeffrey Robinson, explained in his general introductory report that he assigned a 20% vacancy rate for the office buildings, and a 5% to 10% vacancy rate for the industrial buildings. Robinson concluded that there was no measurable environmental stigma.

Given the nature of this complex, we conclude that Coyle's methodology was within reason (see Matter of Commerce Holding Corp. v Board of Assessors of Town of Babylon, 88 NY2d at 731-733). The asserted deficiencies in the appraisal and the methodology utilized go to the weight of this evidence, but do not render the proof deficient as a matter of law. As such, Supreme Court erred in finding that petitioners failed to overcome the presumption of validity. Having so determined, we are required to "weigh the entire record, including evidence of claimed deficiencies in the assessment, to determine whether petitioner[s] [have] established by a preponderance of the evidence that [the] property has been overvalued" (Matter of FMC Corp. [Peroxygen Chems. Div.] v Unmack, 92 NY2d at 188; see Matter of Kohl's Ill. Inc. #691 v Board of Assessors of the Town of Clifton Park, 123 AD3d 1315, 1316 [2014]).

As for the extent of the record, we are not persuaded by petitioners' assertion that Supreme Court abused its discretion in allowing respondents to serve a supplemental report for the years 2010 and 2011 for parcels 22, 23, 24 and 52. The record

indicates that the parties exchanged appraisals pursuant to 22
NYCRR 202.59 (g) on September 11, 2013.  By letter application
dated October 11, 2013, respondents requested permission to serve
the supplemental report, explaining that the petitions for those
years and parcels had not been provided to the appraiser.  Copies
of the supplemental report were provided to petitioners at the
time of the request.  With a trial date scheduled to commence on
October 23, 2013, the court was authorized to allow the
supplemental report for good cause shown (see 22 NYCRR 202.59
[h]).  The scope of work for the supplemental report was the same
as the original report, with a higher valuation determined for
2009 to reflect stronger market conditions.  Notably, as
discussed next, the report actually confirmed that each of these
parcels was overvalued.  Given the voluminous documentation
involved in this complex dispute, as evidenced by the appellate
record, we perceive no abuse of discretion in the court's
decision to accept the report.

     In addressing the specific appraisals, we begin by noting
that Robinson assigned values to parcels 4, 5S, 22, 23, 24, 25,
33, 42, 43, 51 and 52 lower than those fixed by respondent Town
of Ulster Assessor for each year at issue.[3]  Accordingly,

---

     [3]  To summarize, the following parcels were overvalued by
the amounts indicated.

(a) 2010 Assessment

| Parcel (By Building number) | Equalized Full Value (Assessed Value ÷ State Equalization Rate) | Appraised Value | Overvalued |
|---|---|---|---|
| 4 | $1,342,300 | $   750,000 | $   592,300 |
| 5S | 1,879,000 | 330,000 | 1,549,000 |

| | | | |
|---|---|---|---|
| 22 | 2,013,400 | 1,800,000 | 213,400 |
| 23 | 2,147,600 | 1,525,000 | 622,600 |
| 24 | 2,013,500 | 1,525,000 | 488,500 |
| 25 | 7,382,600 | 6,400,000 | 982,600 |
| 33 | 838,900 | 740,000 | 98,900 |
| 42 | 3,221,500 | 2,825,000 | 396,500 |
| 43 | 2,684,600 | 2,325,000 | 359,600 |
| 51 | 671,000 | 600,000 | 71,000 |
| 52 | 5,704,698 | 4,850,000 | 854,698 |

(b) 2011 Assessment

| Parcel (By Building Number) | Equalized Full Value | Appraised Value | Overvalued |
|---|---|---|---|
| 4 | $1,235,500 | $ 710,000 | $525,500 |
| 5S | 617,700 | 310,000 | 307,700 |
| 22 | 2,047,600 | 1,700,000 | 347,600 |
| 23 | 1,919,600 | 1,450,000 | 469,600 |
| 24 | 1,919,600 | 1,450,000 | 469,600 |
| 25 | 6,795,200 | 6,100,000 | 695,200 |
| 33 | 772,200 | 700,000 | 72,200 |
| 42 | 2,965,200 | 2,675,000 | 290,200 |
| 43 | 2,471,000 | 2,225,000 | 246,000 |
| 51 | 618,000 | 570,000 | 48,000 |

subject to further adjustments made herein, we reduce certain assessments at a minimum to reflect Robinson's appraisal value (see Matter of Ulster Bus. Complex v Town of Ulster, 293 AD2d at 722-723). Notably, from this group, buildings 33, 42, 43 and 52 are situate in the rear of the campus, along with building 64. With the exception of building 33, these buildings do not require extensive renovation, and Coyle actually appraised the value of buildings 42, 43 and 52 higher than Robinson. As such, no further adjustments will be made for buildings 42, 43 and 52.

Building 33 is identified as a light industrial structure,

| 52 | 5,439,000 | 4,600,000 | 839,000 |

(c) 2012 Assessment

| Parcel (By Building Number) | Equalized Full Value | Appraised Value | Overvalued |
|---|---|---|---|
| 4 | $1,297,800 | $   710,000 | $587,800 |
| 5S | 639,000 | 310,000 | 329,000 |
| 22 | 2,047,600 | 1,700,000 | 347,600 |
| 23 | 1,919,600 | 1,450,000 | 469,600 |
| 24 | 1,919,600 | 1,450,000 | 469,600 |
| 25 | 7,038,600 | 6,100,000 | 938,600 |
| 33 | 799,800 | 700,000 | 99,800 |
| 42 | 3,071,400 | 2,675,000 | 396,400 |
| 43 | 2,559,500 | 2,225,000 | 334,500 |
| 51 | 640,000 | 570,000 | 70,000 |
| 52 | 5,439,000 | 4,600,000 | 839,000 |

built in 1954.  While Robinson acknowledged that the roof needed
to be replaced, he made no adjustment to replace the roof.
Valuing the building at $20 per square foot, Robinson included a
deduction of $1.50 per square foot to install a heating,
ventilation and air conditioning (hereinafter HVAC) system.
Based on comparable sales and an income analysis, Robinson opined
that the final value for 2010 was $740,000, and for 2011 and 2012
it was $700,000.  Coyle also valued the property at $20 per
square foot.  He then utilized Trommelen's cost estimates to
determine a value of $550,000, factoring in a roof replacement
cost estimated at $243,000.  We conclude that the Coyle valuation
is more reasonable and, accordingly, further reduce the
assessment of building 33 to $550,000 for 2010, 2011 and 2012.
As for building 64, Coyle valued this building higher than the
Assessor.  Coyle valued building 29, which was partially occupied
and located in the rear campus area, only slightly below the
effective assessed value of $302,000 that was in line with
Robinson's appraisal.  Thus, no changes will be made to the
assessments for buildings 64 and 29.

        We turn next to the second distinct group of parcels, those
with potential office use (21, 22, 23, 24 and 25).  Coyle
employed an income approach to value buildings 22, 23 and 24,
assigning a rental value of $8 per square foot and a 25% vacancy
rate, while offsetting the renovation costs outlined in
Trommelen's reports.  In capitalizing income for each building,
Coyle defined a rate of 9.75%, without adding a tax load factor —
on the assumption that future leases would be on a net basis with
the lessee obligated to pay the real estate taxes.  By
comparison, Robinson generally used a capitalization rate of
9.5%, adding in a tax rate of 3.8% for an overall capitalization
rate of 13.3%.  Coyle valued building 22 at $1,250,000, building
23 at $1,070,000, and building 24 at $795,000.  Utilizing both
the comparable sales and income approaches, Robinson set a value
of $39 per square foot with respect to comparable sales and a
rental value of $13 per square foot, with a 20% vacancy rate, for
income purposes to reach a cumulative value of $1,700,000 for
building 22, $1,450,000 for building 23, and $1,450,000 for
building 24.  Apart from the variations in rental value, vacancy
rate and capitalization rates, Robinson did not offset renovation
costs for building 22, but did so for buildings 23 and 24 —

ostensibly offsetting $1.50 per square foot for the replacement of the HVAC system.[4]  By comparison, Coyle offset $265,000 to retrofit building 22, $227,700 for building 23 and $604,800 for building 24.  For each of these buildings, Trommelen included the replacement of the HVAC systems at $1.59 per square foot, together with extensive interior and electrical work. Recognizing that the structures have to be restored for purposes of occupancy, we find Coyle's renovation offsets were warranted. That said, we agree with respondents that Coyle's expense reserve for both future tenant renovations and major replacements of $0.25 per square foot was excessive.  Considering the various factors, we conclude that a reasoned value for building 22 is $1,450,000, for building 23 is $1,200,000 and for building 24 is $1,100,000.

As for building 21, both appraisers valued the property in excess of the equalized full value determined by the Assessor and thus no change in the assessment is warranted.  By comparison, the appraisers significantly differed as to the value of buildings 25 and 5N, both of which lack operable HVAC systems. Building 25 is a stand-alone three-story office building constructed in 1984, with 270,000 square feet of space.  Robinson applied the $1.50 per square foot offset for the HVAC system, and also negatively adjusted the comparable sales by 20% to 30% in recognition of the need to re-fit the premises to current office standards.  In doing so, he assigned a value of $29 per square foot to the building.  For his income analysis, he set market rent at $12 per square foot with a 20% vacancy allowance. Reconciling both the comparable sales and income approach, he valued the building at $6,400,000 for 2009 with a 5% downward

---

[4]  While Robinson's appraisal expressly calls for the HVAC deduction of $1.50 per square foot (equal to $62,646 for each building), it is difficult to discern how that deduction was actually included in either the comparable sale or income calculations of value.  Specifically, Robinson did not deduct the "[c]ost to cure" from the "[m]arket value conclusion" to derive the "as is" value in his comparable sales analysis.  By comparison, the deduction was made for other buildings, including 1, 3, 5N and 25.

adjustment to $6,100,000 for 2010 and 2011.  Coyle, in turn, valued the building at $695,000, using both the comparable sales and income approach.  Similar to Robinson, he assigned a value of $31 per square foot to the building based on the comparable sales and used a market rent of $8 per square foot for income purposes. While observing that the building is equipped with energy efficient thermoplane windows and a modern exterior facade, Coyle concluded that the building would require renovations estimated to cost more than $7,600,000.  With this offset, he assigned a value of $695,000.

In our view, Coyle's renovation proposal includes certain major renovations necessary to ready building 25 for suitable occupancy, but goes beyond the basic amenities as to interior costs.  We do not take issue with the need to install the HVAC system, which includes a cooling chiller with vertical cooling towers, but the estimate at $6.79 per square foot totaling $1,800,000 is not conservative.  Similarly, the proposal also includes a significant quote for electrical lighting at a cost of $2,800,000 and the removal and installation of carpeting at $1,800,000.  We do not see carpeting as a necessary offset for purposes of determining a reasonable assessment value for this building.  On balance, considering Coyle's pre-offset valuation of the building at $8,370,000, less a reasoned restoration cost, we conclude that building 25 should be valued at $4,250,000.

Building 5N is a three-story, former computer manufacturing facility containing 321,000 square feet of space.  The first two floors are described by Robinson as open space, with the third floor consisting of cubicle space.  Robinson utilized the same calculations applied to building 25 to arrive at a value of $7,600,000 for 2010, reduced to $7,200,000 for 2011 and 2012. Coyle, in turn, utilized an income analysis with a market rent value of $3.50 per square foot to value the building at $4,250,000, subject to a $7,000,000 offset.  The Trommelen report calls for the removal and replacement of the ceiling tiles at a total cost of approximately $932,000, a new HVAC system akin to building 25 at an estimated cost of $2,180,000 and an electrical system priced at $3,450,000.  While we do not dispute the necessity of these items to render the premises suitable for occupancy, a reasoned reduction is in order for purposes of

computing the assessment value.  On balance, we conclude that building 5N should be valued at $4,000,000.

We turn next to the remaining parcels in the "central core" (1, 2, 3, 4, 5S, 31/32, 34 and 35).  As indicated, building 5S has been demolished and we have already determined that the parcel was overvalued.  Also, as indicated, Coyle assigned only a land value to parcels 2, 4, 34 and 35, concluding that each building on these parcels should be demolished given the need for extensive renovations and the corresponding benefit of opening space around the adjacent structures.  Robinson valued building 2 at $690,000 for 2010, reduced to $660,000 for 2011 and 2012, providing only a cost to cure offset to install a new HVAC system at $1.50 per square foot.  By comparison, Coyle determined a market value of $555,900, but concluded that the building was functionally obsolete due to the need for extensive renovations. Of particular import is the need for a new roof estimated to cost $280,700.  Interior renovations are estimated at over $500,000 and a new electrical system is listed at $263,800.  Given the condition of the structure, we agree with Coyle's determination to assign a land value of $208,000 to building 2.  We reach the same conclusion with respect to buildings 4, 34 and 35 and accept Coyle's respective valuations at $170,000, $76,000 and $84,000.

Buildings 1 and 3 were built in 1956 and fall within the light industrial category.  Neither building has an HVAC system, and, as with the other properties, Robinson deducted the cost for a new system at $1.50 per square foot in determining market value.  Reconciling his comparable sales and income analysis, Robinson valued each building at $3,400,000 for 2010, reduced by 5% to $3,250,000 for 2011 and 2012.  There were slight variations between Robinson's and Coyle's valuation factors for the building, with Coyle actually assigning a value of $19 per square foot, compared to Robinson's $16 per square foot.  The vacancy rates were similar, with Coyle using a 15% rate compared to Robinson's 10% rate.  Based on both a comparable sales and income analysis, without offsets for restoration, Coyle actually valued each building higher than Robinson — assigning a value of approximately $4,800,000 to each structure.  As with several of the other buildings at issue, the major difference between the two appraisals is in the "cost to cure" component.  The Trommelen

report estimated significant costs for the replacement of the roof, extensive interior and exterior renovations and new electrical systems for each building. As indicated above, these are the types of improvements that are required for suitable occupancy. That said, a reasoned reduction in the estimated costs appears warranted. We conclude that a reasoned value for each building is $2,200,000.

Located on the same tax parcel, buildings 31 and 32 were appraised together, with Robinson arriving at a value of $670,000 and Coyle assigning a land-only value of $205,000. As previously indicated, building 31, the former power house, has been demolished. The discrepancy in Coyle's appraisal is that he has factored in a scope of work to renovate the structures for just under $800,000, while Trommelen's report speaks only to demolition costs. As such, we decline to disturb the assessments for this parcel.

Accordingly, the petitions should be granted to the extent set forth herein.

Peters, P.J., Garry and Rose, JJ., concur.

ORDERED that the order is modified, on the law, without costs, by reducing the assessments as more fully set forth in this Court's decision and petitions granted to said extent, and, as so modified, affirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court